**UNITED STATES of America, Plaintiff,**

**v.**

**Timothy James McVEIGH and Terry Lynn Nichols, Defendants.**

**No. CR–95–110 MH.**

United States District Court, W.D. Oklahoma.

Feb. 20, 1996.

Patrick M. Ryan, U.S. Attorney for the Western District of Oklahoma, Joseph Hartzler, Special Assistant U.S. Attorney, Assigned from S.D. Illinois, Larry Mackey, Tri-

al Counsel, Assigned from S.D. Indiana, Oklahoma City, OK, for plaintiff.

Stephen Jones, Robert Nigh, Jr., Jones, Wyatt & Roberts, Enid, OK, Richard H. Burr III, Houston, TX, for defendant McVeigh.

Michael Tigar, Austin, TX, Ronald C. Woods, Houston, TX, D. Kate Rubin, Deputy Federal Public Defender, Oklahoma City, OK, for defendant Nichols.

## MEMORANDUM OPINION AND ORDER ON MOTIONS FOR CHANGE OF VENUE

MATSCH, Chief Judge.[*]

This criminal proceeding arises from an explosion in Oklahoma City, Oklahoma, on April 19, 1995, at 9:02 a.m. The measurable effects of that event include the deaths of 168 identified men, women and children, injuries to hundreds of other people, the complete destruction of the Alfred P. Murrah Federal Office Building and collateral damage to other buildings, including the United States Courthouse. A damage assessment prepared for the Office of State Finance, The State of Oklahoma, estimated the total incident cost at $651,594,000. The immeasurable effects on the hearts and minds of the people of Oklahoma from the blast and its consequences were thoroughly explored in the hearing on the defendants' motions for a change of venue under Rule 21(a) of the Federal Rules of Criminal Procedure in Oklahoma City on January 30 through February 2, 1996.

Through the grand jury indictment filed in this district on August 10, 1995, the government has charged that Timothy McVeigh and Terry Nichols conspired with others unknown, beginning in September 1994, to use a "truck bomb" to damage the Alfred P. Murrah Federal Building and to kill and injure the people in it and that these two defendants caused the explosion on April 19, 1995. Other counts charge these defendants, jointly, with the use of a bomb as a weapon of mass destruction, resulting in federal property damage and death and personal injury in violation of 18 U.S.C. §§ 2332a and 2(a) & (b); with the intentional, willful and malicious damage and destruction of government property and death and injury to persons by means of an explosive bomb placed in a truck in violation of 18 U.S.C. §§ 844(f) and 2(a) & (b) and with first degree murder of eight federal law enforcement officers in violation of 18 U.S.C. §§ 1114, 1111 and 2(a) & (b) and 28 C.F.R. § 64.2(h). The prosecution has filed notices of intention to seek the penalty of death as to both defendants on all counts.

■ Article III of the United States Constitution provides that criminal trials shall be held in the state where such crimes have been committed. The Sixth Amendment of the Constitution provides as follows:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed—

The Due Process Clause of the Fifth Amendment of the United States Constitution requires fundamental fairness in the prosecution of federal crimes. The right to an impartial jury in the Sixth Amendment and the fundamental fairness requirement of the Due Process clause will override the place of trial provisions in both Article III and the Sixth Amendment in extraordinary cases. That is the foundation for Fed. R.Crim P. 21(a) providing for a change of venue to protect from prejudice. The rule reads as follows:

> The court upon motion of the defendant shall transfer the proceeding as to that defendant to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

■ The Notes of Advisory Committee on Rules, published with this rule in 1944, make clear that a change of venue can be granted

---

[*] Chief Judge Richard P. Matsch, District of Colorado, sitting by designation.

only on the motion of a defendant since the constitutional requirement for trial in the state and district where the offense was committed under Article III and Amendment VI is a right of the defendant. The filing of the motion waives that right.

 The initial question is whether the evidence now before the court shows that there is so great a prejudice against these defendants in the Western District of Oklahoma that they cannot obtain a fair and impartial trial at any place fixed by law for holding court in this district.

Oklahoma City is the principal place for holding court. Judge Alley found that obtaining an impartial jury in Oklahoma City would be "chancy." He designated Lawton, Oklahoma as the place for this trial under the authority of Fed.R.Crim.P. 18 requiring that due regard be given to the convenience of the defendants and the witnesses. The defendants filed objections to that designation. The evidence presented at the hearing on the defendants' Rule 21(a) motion demonstrates that a trial of these charges in Lawton is not practicable. The facilities there are inadequate. It was stipulated that renovations to the courthouse and related facilities would cost at least $1 million dollars. The time needed for construction would delay scheduling the trial.

There is no disagreement among the parties with Judge Alley's concern about a trial in Oklahoma City. The effects of the explosion on that community are so profound and pervasive that no detailed discussion of the evidence is necessary. The motions for change of venue are granted as to the Western District of Oklahoma.

The selection of an alternative venue is within the discretion of the court. The government has suggested transfer to the Northern District of Oklahoma with trial at the restored historic courthouse in Tulsa. Although the defendants argue that they do not have to prove prejudice in that district, the court has considered Tulsa as the presumptive transferee district because of the language of Article III, Sec. 2, cl. 3, and the expressed wishes of many of the victims as revealed in the evidence and the arguments of government counsel.

Although no one has suggested a trial in the Eastern District of Oklahoma, to avoid further controversy the focus of this inquiry is enlarged to consider whether there is so great a prejudice against these defendants in the State of Oklahoma that they cannot obtain a fair and impartial trial anywhere in the state.

 Ordinarily, the effects of pre-trial publicity on the pool from which jurors are drawn is determined by a careful and searching voir dire examination. That is the preferred practice in this judicial circuit. *United ed States v. Pedraza,* 27 F.3d 1515, 1525 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 347, 130 L.Ed.2d 303 (1994); *United States v. Abello–Silva,* 948 F.2d 1168, 1177 (10th Cir.1991), *cert. denied,* 506 U.S. 835, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992). Deferment of the venue motions in this case is impracticable and inimical to the public interest in obtaining a just determination of these charges without undue delay. It is apparent that some special precautions and logistical arrangements must be taken in preparation for trial of these charges at any location. The scope and intensity of the public interest necessitates it. The safety of the accused and all trial participants must be considered as well. Moreover, a failed attempt to select a jury would, itself, cause widespread public comment creating additional difficulty in beginning again at another place for trial.

The parties have submitted a large volume of evidence concerning news coverage of the explosion, the rescue effort, the investigations by law enforcement agencies and media sources, the arrests of the defendants, court proceedings and community activities. Extensive print news coverage in Oklahoma City, Tulsa and Lawton has been submitted. Videotapes of local and national telecasts from April 19, 1995, to the date of the motions hearing were admitted and have been reviewed.

Initially, national media coverage of the explosion was extremely comprehensive. Dramatic pictures of the Murrah Federal Building were shown nationwide immediately after the explosion. There was intensive coverage of the rescue efforts. The immediate

reactions of the President, the Attorney General, and an FBI spokesman were broadcast across the nation. There were extensive interviews with injured victims, members of the families of the dead and missing persons, rescue and relief workers, and residents of Oklahoma City. The Governor of the State of Oklahoma was a continual presence in the media coverage, providing strong leadership and articulating the needs and spirit of the entire state.

The arrest of Timothy McVeigh on April 21 in Perry, Oklahoma as a bombing suspect produced film showing him in restraints and clad in bright orange jail clothing being led into a van while surrounded by a very vocal and angry crowd. Some bystanders could be heard shouting "murderer" and "baby killer." This footage was seen nationwide and was widely used in later television broadcasts about other developments in the government's investigation. There was widespread publicity about a search for another suspect described as John Doe #2. The arrest of Terry Nichols and a search of his brother's farm in Michigan were other subjects of national publicity.

As time passed, differences developed in both the volume and focus of the media coverage in Oklahoma compared with local coverage outside of Oklahoma and with national news coverage. These differences were discussed in the testimony of Russell Scott Armstrong, an expert in news media analysis. In the weeks following the explosion, there was less media coverage of the explosion outside of Oklahoma. Developments in the government investigation were reported, but such reports were primarily factual in nature. Oklahoma coverage, in contrast, remained focused on the explosion and its aftermath for a much longer period of time. Television stations conducted their own investigations, interviewing "eyewitnesses" and showing reconstructions and simulations of alleged events. Such "investigative journalism" continued for more than four months after the explosion. Perhaps most significant was the continuing coverage of the victims and their families. The Oklahoma coverage was more personal, providing individual stories of grief and recovery. As late as December 1995, television stations in Oklahoma City and Tulsa were broadcasting special series of individual interviews with family members and people involved in covering the explosion and its aftermath. (See McVeigh Exhibit M–11B).

According to Armstrong, these differences in media coverage reflect the different needs of the Oklahoma media market compared to the nationwide media market. He observed that, as a national story of great importance, people across the country wanted to know the "who, what, where, why, and when" of this event. The nation was interested in the human story of suffering and renewal, but in a more general sense. In contrast, because this was a crime that occurred in their state, Oklahomans wanted to know every detail about the explosion, the investigation, the court proceedings and, in particular, the victims.

Armstrong opined that the greater informational needs of Oklahomans resulted from a perception that Oklahomans are united as a family with a spirit unique to the state. Indeed, the "Oklahoma family" has been a common theme in the Oklahoma media coverage, with numerous reports of how the explosion shook the entire state, and how the state has pulled together in response. The political leadership of the state has repeatedly and consistently emphasized the bonds tying all Oklahomans together as family and proclaiming to the nation and the world that the survival and recovery from this tragedy is "Oklahoma's story." (Nichols Exhibit HA, Epilogue to *In Their Name*). Oklahoma Governor Frank Keating best described the unity and spirit of Oklahoma:

In the weeks after the bombing, Oklahomans showed the world what good people can accomplish when they are faced with an overwhelming tragedy. What happened on April 19 was the worst instance of terrorism and mass murder in American history. What followed set a standard for courage and compassion: The Oklahoma Standard.

(Nichols Exhibit P, "The Oklahoma Standard" at 9). This same theme is dominant in the books and pamphlets published as commemoratives of the event and its aftermath

and distributed throughout the state. It is also expressed in many of the televised interviews of rescue workers and citizens on the street.

There is an evident and understandable pride of accomplishment in all that has been done to try to return to normalcy. Prominently displayed in the state capitol building is the artwork of survivors and families of the deceased done at a state sponsored gathering at Quartz Mountain under the heading "Celebration of the Spirit." Many Oklahomans view a trial of this case as an additional challenge and want the opportunity to demonstrate their ability to be fair in spite of this extraordinary provocation of their emotions of anger and vengeance. They seek participation in the trial to demonstrate an ability to overcome a tragedy with such powerful emotional impact that people have come to measure time by it.

█ Pride is defined as satisfaction in an achievement, and the people of Oklahoma are well deserving of it. But it is easy for those feeling pride to develop a prejudice, defined as "(a) an adverse judgment or opinion formed beforehand or without knowledge or examination of the facts and (b) a preconceived preference or idea." The American Heritage Dictionary of the English Language (3d ed.1992). The existence of such a prejudice is difficult to prove. Indeed it may go unrecognized in those who are affected by it. The prejudice that may deny a fair trial is not limited to a bias or discriminatory attitude. It includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence. That something has its most powerful effect if it generates strong emotional responses and fits into a pattern of normative values.

In this case the repetition of emotionally intense stories of loss and grief and the valiant efforts to overcome the consequences of this event have developed a common belief that the citizens of Oklahoma can and must take what many believe to be the necessary last step on the road to recovery—participation in the trial of these accused men. The character of the crimes charged is so contrary to the public expectation of human behavior that there is a prevailing belief that some action must be taken to make things right again. That theme is dominant in the comments of people interviewed by television reporters asking about their reactions to court proceedings in this case. The common reference is to "seeing that justice is done." There is a fair inference that only a guilty verdict with a death sentence could be considered a just result in the minds of many.

The emotional burden of the explosion and its consequences has been intensified by the repeated and heavy emphasis on the innocence of the victims and the impact of their loss on their families. The tragic sense is heightened by the deaths of infants and very young children in the day care center. The horror of that fact has been powerfully portrayed by the symbols of teddy bears and angels displayed everywhere in Oklahoma. They were placed on a Christmas Tree at the State Capitol. The public sympathy for victims is so strong that it has been manifested in the very courthouse where these motions were heard, when on the first day of the hearing a T-shirt was sold bearing the following inscription:

Those Lost Will Never
Leave Our Hearts
Or be Forgotten
April 19, 1995
United States Court
Western District of Oklahoma

(Nichols Exhibit ZE). The shirt also exhibited the purple ribbon which is a ubiquitous symbol of empathy and unity throughout Oklahoma, even appearing on special license plates.

The intensity of the humanization of the victims in the public mind is in sharp contrast with the prevalent portrayals of the defendants. They have been demonized. The videotape footage and fixed photographs of Timothy McVeigh in Perry have been used regularly in almost all of the television news reports of developments in this case. All of the Oklahoma television markets have been saturated with stories suggesting the defendants are associated with "right wing militia groups." File film shows people in combat fatigues firing military style firearms to illus-

trate the suggested association. That theme has particularly been emphasized with Terry Nichols and his brother. These films have also been shown in Denver and on national news programs but not with the frequency of the use by broadcast outlets in Oklahoma.

New film showing the defendants in restraints and body armor was taken in the sally port of the jail in Oklahoma City when they were being brought to court for hearing these motions. It was shown nationally and locally in connection with reports of the court proceedings.

The possible prejudicial impact of this type of publicity is not something measurable by any objective standards. The parties have submitted data from opinion surveys done by qualified experts who have given their opinions about the results and their meaning. The government places heavy reliance on this evidence to support the position that a fair and impartial jury can be selected in the Northern District of Oklahoma for a trial in Tulsa. Such surveys are but crude measures of opinion at the time of the interviews. Human behavior is far less knowable and predictable than chemical reactions or other subjects of study by scientific methodology. There is no laboratory experiment that can come close to duplicating the trial of criminal charges. There are so many variables involved that no two trials can be compared regardless of apparent similarities. That is the very genius of the American jury trial.

The expert witnesses who have studied in this area have suggested that voir dire of the jury panel is the only technique available to minimize the effects of pre-trial publicity and that most jurors develop fixed opinions by the conclusion of lawyers' opening statements. While those opinions may be justified by the research done, consisting largely of simulated trials, this view is inconsistent with this court's long experience with jury trials both as lawyer and judge. That experience fortifies a faith that a properly conducted trial with competent counsel on both sides with adequate resources available to them will reveal the historical facts relevant to the charges and that jurors who have adequate protection from external influences will reach a just verdict according to the law and evidence.

■ Extensive publicity before trial does not, in itself, preclude fairness. In many respects media exposure presents problems not qualitatively different from that experienced in earlier times in small communities where gossip and jurors' personal acquaintances with lawyers, witnesses and even the accused were not uncommon. Properly motivated and carefully instructed jurors can and have exercised the discipline to disregard that kind of prior awareness. Trust in their ability to do so diminishes when the prior exposure is such that it evokes strong emotional responses or such an identification with those directly affected by the conduct at issue that the jurors feel a personal stake in the outcome. That is also true when there is such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience.

The opinion surveys done for this hearing attempted to test the ability of the persons questioned to be fair and impartial jurors. There has been disagreement with some of the questions included in the survey form used by Dr. Donald E. Vinson. The government's response has been that there are no significant differences in the results obtained with those from the defendants' questionnaire. That is the type of dispute of interest in academic circles. What is most important to this court is that the survey forms do not recognize the expanded role of a jury in a death penalty case. The first duty is to determine after hearing all of the evidence in the case, whether the government has proved all of the essential elements of each charge beyond a reasonable doubt. The jury must separate that standard of legal guilt from any opinions concerning probabilities or any notions of moral culpability. The commonly used phrase "presumption of innocence" is not an appropriate or even apt description of the position of an accused in this court. What is more descriptive is whether a juror is ready, willing and able to give a defendant the benefit of a reasonable doubt after careful consideration of all of the evidence admitted at a trial.

**1474**

■ If a defendant is found guilty on any of the present charges, the jury will then be required to determine whether death is justified for the offense of conviction after consideration of the mitigating and aggravating factors presented by evidence received at a further hearing. 18 U.S.C. §§ 3591–3593. The Supreme Court of the United States has struggled with the constitutional legitimacy of a death sentence under the Eighth Amendment since the *per curiam* decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), with each of the justices constituting the majority writing separate concurring opinions. The question became somewhat better focused in a joint opinion of justices Stewart, Powell and Stevens in *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), explaining that the discretion given to a sentencing body "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." There must be individualized consideration of the defendant and any mitigating evidence relevant to him. *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1981) (citing *Lockett).*

■ What has been made clear by later cases is that a sentencing jury must be prepared to make a moral judgment which is individual to the particular defendant after consideration of aggravating and mitigating circumstances specifically as to him. Moreover, the Court has held that due process requires such impartiality of any jury that undertakes capital sentencing that a voir dire examination of potential jurors must include inquiry into the views of prospective jurors on the death penalty, and those who would automatically vote for or against it must be excluded. *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). General questions of fairness and impartiality are insufficient. *Id.*

Because the penalty of death is by its very nature different from all other punishments in that it is final and irrevocable, the issue of prejudice raised by the present motions must include consideration of whether there is a showing of a predilection toward that penalty. Most interesting in this regard is the frequency of the opinions expressed in recent televised interviews of citizens of Oklahoma emphasizing the importance of assuring certainty in a verdict of guilty with an evident implication that upon such a verdict death is the appropriate punishment. It is significant that there is a citizens' movement in Oklahoma to support pending legislation which would sharply limit the reviewability of a death sentence.

Upon all of the evidence presented, this court finds and concludes that there is so great a prejudice against these two defendants in the State of Oklahoma that they cannot obtain a fair and impartial trial at any place fixed by law for holding court in that state. The court also finds and concludes that an appropriate alternative venue is in the District of Colorado.

Denver, Colorado meets all of the criteria that have been cited by past cases as relevant when selecting an alternative venue. *See e.g., United States v. Tokars,* 839 F.Supp. 1578 (N.D.Ga.1993); *United States v. Moody,* 762 F.Supp. 1491 (N.D.Ga.1991). Denver is a large metropolitan community with many community resources. It is readily accessible, being well-served by daily non-stop flights from all relevant cities. The court facilities in Denver are well-suited for accommodating the special needs of this trial. The United States Marshal for the District of Colorado is well equipped to provide adequate security services. A large jury pool is available.

In reaching this ruling, the court is acutely aware of the wishes of the victims of the Oklahoma City explosion to attend this trial and that it will be a hardship for those victims to travel to Denver. The attorneys for the government have earnestly argued that statutory provisions for victims must be considered by the court. The Department of Justice is required to give prescribed care and consideration to those affected by criminal conduct. The United States Attorney for the Western District of Oklahoma has clearly complied with these requirements by providing information and staff assistance and will continue to do so. Assistant United States Attorney K. Lynn Anderson, who heads the

Victim Assistant Unit of the United States Attorney's Office, described the Unit's continuing efforts to assist and inform the 2,200 people identified in the Unit's data base. Further, as observed on the record at the hearing, this court has considered the brief filed on behalf of victims as *amicus curiae.* The interests of the victims in being able to attend this trial in Oklahoma are outweighed by the court's obligation to assure that the trial be conducted with fundamental fairness and with due regard for all constitutional requirements.

Upon the foregoing, it is

ORDERED that this criminal proceeding is transferred to the United States District Court for the District of Colorado.