**UNITED STATES of America, Plaintiff,**

v.

**Gerardo HERNANDEZ a/k/a Manuel Viramontez, et al., Defendants.**

No. 98–0721–CR.

United States District Court, S.D. Florida.

July 27, 2000.

Caroline Heck Miller, Assistant United States Attorney, Miami, FL, for plaintiff.

William M. Norris, Coconut Grove, FL, Joaquin Mendez, Federal Public Defender's Office, Miami, FL, Paul A. McKenna, Miami, FL, Jack Blumenfeld, Coral Gables, FL, Philip Horowitz, Miami, FL, for defendants.

### ORDER DENYING WITHOUT PREJUDICE MOTIONS FOR CHANGE OF VENUE

LENARD, District Judge.

**THIS CAUSE** is before the Court on Defendants' Motions for Change of Venue. (D.E.# 317, 321, 329.) Having reviewed the Motions and the record, having heard the oral arguments of the parties, and having been otherwise advised in the premises, the Court finds, for the reasons set forth below, that Defendants have failed to demonstrate that a change of venue is required to protect Defendants'

right to receive a fair trial by an impartial jury.

## I. Introduction

The Second Superseding Indictment charges Defendants in this case with, *inter alia*, conspiracy to become unregistered foreign agents, becoming unregistered foreign agents, and conspiracy to commit espionage. (D.E.# 224.) Defendants are alleged to have been part of a Cuban espionage ring that infiltrated and reported on United States military activities, in particular those occurring at the Naval Air Station at Boca Chica Key, Florida. By a separate count in the Second Superseding Indictment, the conduct of Defendant Gerardo Hernandez is alleged to have culminated in the shootdown of two private aircraft from the United States and the deaths of four members of Brothers to the Rescue, a Miami-based Cuban exile group.

This case is now set to proceed to jury trial on September 5, 2000, at the United States District Courthouse in Miami, Florida. On January 5, 2000, Defendant Antonio Guerrerro filed the initial Motion for Change of Venue. (D.E.# 317.) Subsequently, Defendants Luis Medina (D.E.# 321), and Ruben Campa (D.E.# 329), filed separate Motions seeking the same relief. Defendants Gerardo Hernandez and Rene Gonzalez have joined in the Motions, but have not filed separate pleadings. The Government filed a Response to the Motions (D.E.# 441), and on June 26, 2000, the parties appeared before the Court for oral argument on the Motions.

## II. Analysis

Defendants seek a change of venue of the trial of this case, *i.e.*, to have the trial held in Fort Lauderdale rather than in Miami.[1] Defendants argue that if the trial is held in Miami they will be denied their rights to due process of law and a fair trial

with an impartial jury because of the inflamed atmosphere in this community concerning the activities of the government of the Republic of Cuba. (D.E. # 317 at 2.) In opposition to the Motions, the Government maintains that Defendants have not met their burden of showing that a different jury venire is necessary in these circumstances, and, in particular, disputes the methodology and conclusions of the survey conducted by Defendants' expert in support of their argument that pervasive community prejudice exists.

### A. Legal Standard

The Fifth Amendment to the United States Constitution assures a criminal defendant the right to due process of law, and the Sixth Amendment guarantees the right to an "impartial jury." U.S. Const. amend. V, VI. To protect these rights, a district court may transfer proceedings to another district "if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in the district." Fed.R.Cr.P. 21(a); *see also Pamplin v. Mason*, 364 F.2d 1, 5 (5th Cir.1966) ("Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial.")

These protections do not mean, however, that a criminal defendant is constitutionally entitled to a trial by jurors ignorant of issues and events relating to the trial. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Rather, "due process requires only that a jury be seated which can put aside any impressions gained from pretrial publicity and render a

---

**1.** Defendants' written Motions sought a change of venue from the Southern District of Florida to another judicial district. At oral argument, however, Defendants asked that

their Motions be considered requests that the trial be held in Fort Lauderdale, within the Southern District of Florida, rather than Miami. (Tr. of 6/26/00 Hg. at 52:2–7.)

fair verdict based exclusively on the evidence presented in court." *United States v. Fuentes–Coba,* 738 F.2d 1191, 1194 (11th Cir.1984) (citing, *inter alia, Irvin,* 366 U.S. at 723, 81 S.Ct. 1639), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985). As the Supreme Court has explained:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin,* 366 U.S. at 722–23, 81 S.Ct. 1639.

 In seeking a change of venue under Rule 21 prior to trial, the defendant bears the burden of demonstrating: (1) "an actual or identifiable prejudice on the part of the jury resulting from publicity;" (2) "community prejudice actually infecting the jury box;" or (3) sufficient evidence that the pretrial publicity has been "so inflammatory and prejudicial and so pervasive or saturating the community as to render virtually impossible a fair trial by an impartial jury, thus raising a presumption of prejudice." *Ross v. Hopper,* 716 F.2d 1528, 1540 (11th Cir.1983) (internal citations omitted). Whether a change of venue is necessary must be determined from the "totality of the surrounding facts" of the case. *Irvin,* 366 U.S. at 721, 81 S.Ct. 1639. If the court concludes that the defendant has not met the burden of demonstrating prejudice in the community as a whole, the court may then conduct a voir dire examination of the jury to explore any potential bias of the jurors individually.

*See Fuentes–Coba,* 738 F.2d at 1195. In assessing the jurors' opinions, the test is " 'whether the nature and strength of the opinion formed are such as in law necessarily ... raise the presumption of partiality.... Unless [the defendant] shows the actual existence of such an opinion in the mind of the jurors as will raise the presumption of partiality, the juror need not necessarily be set aside.' " *Irvin,* 366 U.S. at 723, 81 S.Ct. 1639 (internal citation omitted).

**B. Supreme Court Precedent**

The case law governing the issue of the effect of pre-trial publicity stems from two Supreme Court cases in the 1960's, in which publicity and media coverage both before and during the trials rendered them "hollow formalities" at best and "three-ring carnivals" at worst. The first, *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), involved six widely-publicized and brutal murders committed in the vicinity of Evansville, Indiana. Following Irvin's arrest for the murders, the prosecutor disseminated throughout Evansville and its adjoining counties several press-releases stating that Irvin had confessed to the murders. *See id.* at 719–20, 81 S.Ct. 1639. Irvin's appointed counsel sought and was granted a change of venue, but the trial was moved only to Gibson, the county adjoining Evansville. *See id.* at 720, 81 S.Ct. 1639. The trial court subsequently denied Irvin's second change of venue motion. *See id.* Reviewing the evidence Irvin presented in support of his motion, the Court found the evidence of the "build-up of prejudice [to be] clear and convincing:" (1) Irvin's trial had become the "cause celebre of this small community" such that a "roving reporter" solicited and recorded "curbstone opinions" that were later broadcast over local stations; (2) there had been a "barrage" of newspaper headlines, articles, cartoons and pictures during the six months preceding the trial; (3) local news and television stations "blanketed" the community with "extensive newscasts" about his background; and

(4) the media reported Irvin's confession, indictment, and offer to plead guilty in exchange for a life sentence rather than the death penalty. *Id.* at 725, 81 S.Ct. 1639.

In view of these facts, the Court found that "[i]t could not be gainsaid that the force of this continued adverse publicity caused a sustained excitement and fostered a strong prejudice among the people of Gibson County." *Id.* at 726, 81 S.Ct. 1639. Examining the voir dire process, the Court determined that a "pattern of deep and bitter prejudice" was present throughout the community as well as among the members of Irvin's jury, two-thirds of whom confessed prior to the trial to having an opinion that he was guilty and a familiarity with the facts and circumstances of the case. *Id.* at 727, 81 S.Ct. 1639. In such circumstances, the Court held that the trial court's finding of the jury's impartiality "did not meet constitutional standards" and therefore, Irvin's detention and death sentence were unconstitutional. *Id.* at 727–28, 81 S.Ct. 1639.

The second case addressed whether Sam Sheppard was deprived of a fair trial in his state conviction for the murder of his wife because of the trial judge's failure to protect him sufficiently from the "massive, pervasive and prejudicial publicity that attended his prosecution." *Sheppard v. Maxwell,* 384 U.S. 333, 334, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). From the moment of the reporting of the death of Sheppard's wife, the media captured every moment of the investigation, prosecution, trial and sentencing including, *inter alia,* Sheppard's re-enactment of his version of the events of the night of the murder, the preliminary hearing broadcast live from the high school gymnasium, and the jurors' visit to the Sheppard home during the trial. *See id.* at 339–42, 86 S.Ct. 1507. In addition to the escalating intensity of the negative and disparaging pre-trial publicity, the trial judge allowed approximately twenty representatives of the news and wire services to sit inside the bar, behind the counsel table, for the length of the trial. *Id.* at 355, 86 S.Ct. 1507. Prejudice

among the jurors was manifest: every juror testified to having read or seen reports of the Sheppard case, and, during the trial, the daily record of the proceedings, including pictures of Sheppard, the judge, the exhibits, and the jurors themselves were printed or broadcast. *See id.* at 345, 86 S.Ct. 1507 (noting that "[d]uring the trial, pictures of the jury appeared over 40 times in the Cleveland papers alone"). One report referred to the atmosphere surrounding the Sheppard case as a "Roman holiday for the news media." *Id.* at 356, 86 S.Ct. 1507.

Despite this "carnival" surrounding the trial, Sheppard was not granted a change of venue nor was his jury sequestered. *Id.* at 352–53, 86 S.Ct. 1507. Reviewing his habeas corpus petition, the Court held that Sheppard's failure to receive a trial by an impartial jury free from outside influences violated his right to due process. *Id.* at 362, 86 S.Ct. 1507. The Court went on to describe remedial measures the trial judge could have taken "prevent prejudice at its inception," including: (1) asking jurors whether they had read or heard specific prejudicial comment about the case; (2) adopting stricter rules governing the use of the courtroom by the media; (3) insulating the witnesses; (4) sequestering the jurors; (5) controlling the release of leads, information and gossip to the press by members of the prosecution; and (6) proscribing extrajudicial statements by any lawyer, party, witness, or court official containing potentially prejudicial matters. *See id.* at 361, 86 S.Ct. 1507.

The Supreme Court later characterized the proceedings in *Irvin* and *Sheppard* as "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). The *Murphy* court then distinguished "largely factual publicity from that which is invidious or inflammatory." *Id.* at 801–02, 95 S.Ct. 2031. Noting that the majority of reports, primarily factual in nature, concerning Murphy had appeared more than

seven months prior to jury selection ·and that only twenty of eighty potential jurors were excused based on their opinion of Murphy's guilt (as compared to 268 excused out of 430 veniremen in *Sheppard*), the Court found that the circumstances did not "suggest a community with sentiment so poisoned against [Murphy] as to impeach the indifference of jurors who displayed no animus of their own." *Id.* at 803, 95 S.Ct. 2031. Thus, the Court held that Murphy had failed to show that the circumstances of his trial were inherently prejudicial or that the jury selection process permitted an inference of actual prejudice. *Id.*

### C. Eleventh Circuit Precedent

Subsequent to the Supreme Court's holding in *Murphy,* the courts in this Circuit have been cautious to provide procedural safeguards to prevent the prejudicial impact of pre-trial publicity. In *United States v. Capo,* 595 F.2d 1086, 1091 (5th Cir.1979), after first finding that the record did not demonstrate the "degree of pervasive community prejudice which would warrant a presumption of jury prejudice," the Court of Appeals held that the "elaborate measures" taken by the district court to ensure that an impartial jury was impaneled also precluded a finding of "prejudice in fact." *Id.* The district court first conducted a collective voir dire of all prospective jurors, inquiring as to their ability to render an impartial verdict and instructing them to decide the case strictly on the evidence and not to discuss the case or read or listen to any news reports on the proceedings. *Id.* at 1091. Over the course of ten days, the court then conducted, *in camera* in the presence of defense counsel, an individual voir dire of each of the jurors based on questions requested by the defense to elicit each juror's knowledge of the case and the details of the crime and any preconceived opinions or partiality.

*Id.* At the end of each day and prior to each recess, the court warned the jurors not to discuss the case or read or listen to any news reports. *Id.* at 1092. Under these circumstances, the Court of Appeals was "satisfied that the procedural safeguards taken by the court produced a fair and disinterested panel of jurors." *Id.* at 1092.

In a case involving a Cuban defendant convicted of violating the Trading With the Enemy Act and the Cuban Assets Control Regulations, the Eleventh Circuit held that the voir dire procedures guaranteed that the jury selected was able to "put aside any impressions gained from pre-trial publicity and render a fair verdict based exclusively on the evidence presented in court" and affirmed the district court's denial of the pre-trial motion for change of venue. *United States v. Fuentes–Coba,* 738 F.2d 1191, 1194 (11th Cir.1984). In ruling on the change of venue motion, the district court first reviewed the survey evidence the defendant had presented and determined that the pre-trial publicity was not so· inflammatory as to raise a presumption of prejudice. *Id.* at 1194. · The court then conducted a voir dire of the jurors, during which defense counsel "extensively inquired" of the potential jurors with respect to their feelings about Cuba and Cuban-sympathetic organizations. *Id.* The Eleventh Circuit held that this "thorough inquiry" of the jury panel on the issue of their potential bias was sufficient to guarantee the defendant's right to a fair trial. *Id.* at 1195.

### D. Defendants Have Not Presented Evidence of Pervasive Community Prejudice as Would Preclude the Selection of a Fair and Impartial Jury in This Case.[2]

██ In support of their Motions, Defendants have provided the Court with more than thirty articles on their case and other

---

**2.** As the Court has yet to empanel the jury venire, any claim that there exists actual or identifiable prejudice of jury members or that community prejudice actually infected the jury box is not yet ripe. Further, the Court

construes Defendants' Motions as directed primarily toward the issue of "pervasive community prejudice," and, accordingly, the Court's analysis focuses on the third inquiry set forth in *Ross. See Ross,* 716 F.2d at 1540.

Cuba-related issues over the last two years. Defendants argue that these articles demonstrate that the community atmosphere is "so pervasively inflamed" that "resort to questioning in the cool reflection of a courtroom is not sufficient to cleanse the record." (D.E. #317 at 3.) Defendants argue that community influences will affect any juror's ability to reach a fair verdict. (*Id.* at 6.)

In response, the Government asserts that the Defendants have failed to carry their burden of demonstrating that it is impossible to select a fair and impartial jury in this community. (D.E. #441 at 3.) The Government maintains that an extensive voir dire of prospective jurors is preferable to a change of venue "because it provides actual, rather than speculative, observation" of the venire and "presents the opportunity to eliminate preconceptions and to determine whether jurors can be 'cured' of prejudice." (*Id.* at 3–4.)

The Court has reviewed the articles submitted by Defendants and finds that the majority of these articles relate to events other than the espionage activities in which Defendants were allegedly involved. (*See, e.g.,* D.E. #329 Ex. I ("Former U.S. POWS Detail Torture by Cubans in Vietnam"); Ex. L (discussing protests of performance by Cuban band); Ex. N, O, P (discussing Elian Gonzalez).) With the exception of articles relating to the sentencing of two co-defendants and one editorial connoting the anniversary of the shootdown, the articles that do pertain to the downing of the Brothers–to–the–Rescue plane were published more than one year ago, *see Capo,* 595 F.2d at 1091 (noting that local news coverage of crimes had subsided substantially by the time of trial), and discuss matters that are largely factual in nature. *See Murphy,* 421 U.S. at

801–02, 95 S.Ct. 2031 (distinguishing factual publicity from that which is invidious or inflammatory). (*See, e.g.,* D.E. #329 Ex. A, B, C, D, E, H.) Based on its review of the materials presented by Defendants, the Court finds that the pretrial publicity has not been "so inflammatory and pervasive as to raise a presumption of prejudice" among the potential jury venire in this case. *Ross,* 716 F.2d at 1541.

In further support of their Motion, Defendants introduced the results of a random survey conducted by Professor Gary Moran.[3] (D.E. #321 Ex. A.) Between December 9 and December 14, 1999, Professor Moran conducted a random survey of 300 registered voters in Miami–Dade County. The survey elicited responses to a questionnaire consisting of eight opinion and twenty demographic inquiries, designed to examine prejudice against anyone alleged to have assisted the Cuban government in espionage activities. (*Id.* at 16.) According to Professor Moran, the results of the survey indicated: (1) that 69% (with a sampling error of 5.3%) of eligible jurors are prejudiced; (2) that 40% of survey respondents (60% of Hispanic respondents) would find it difficult to be impartial, of which 90% would not change their minds under any circumstances; and (3) approximately ⅓ of the respondents are "at least somewhat worried about community criticism in the event of a 'not guilty' verdict." (*Id.*)

The Government argues that Professor Moran's survey is unworthy of this Court's reliance due to numerous flaws in Professor Moran's procedures and conclusions which call into question the validity of his survey. (D.E. #441 at 6.) The Government takes issue with Professor Moran's reliance on two prior surveys concerning South Floridians' attitudes toward Cuba,[4]

3. Professor Moran holds a Bachelor of Arts degree from the University of Florida, a Master's Degree in Psychology from the University of Detroit, and a Ph.D. in Psychology from the Catholic University at Nijmegen, the Netherlands. (D.E. #321 Ex. A at 1.) He is currently a Professor of Psychology at Florida International University. (*Id.*)

4. The first survey was conducted by Jay Schulman in *United States v. Fuentes–Coba,* 738 F.2d 1191 (11th Cir.1984), in which the Eleventh Circuit affirmed the district court's denial of the motion for change of venue. Professor Moran conducted the second survey in the case of *United States v. Broder,* Case No. 97–267–CR–GRAHAM, in which the dis-

and argues that the present survey "is not well designed and does not support the conclusions and resulting opinion" of Professor Moran. (*Id.* at 8–9.)

In support of its position, the Government has submitted the affidavit and curriculum vitae of Professor J. Daniel McKnight.[5] Professor McKnight opined that Professor Moran's prior survey,[6] which concluded that a "substantial prejudice [existed] in the Southern District of Florida against a defendant alleged to have helped the Castro government," (D.E. # 441 Ex. A at 13), lacked "empirical rigor, scientific validity and provides no estimation of its scientific reliability." (D.E. # 441 Ex. B at 2.)

The Court has reviewed the questionnaire and Professor Moran's interpretation of the responses, and, based on the following findings, declines to afford the survey and Professor Moran's conclusions the weight attributed by Defendants. First, the Court finds that 54% of all respondents and 48.5% of Hispanic respondents stated that they were not aware of this case altogether. (D.E. # 321 Ex. E at 1.) Yet, Professor Moran appears to have included these respondents in quantifying the alleged prejudice in this community against Defendants.

Second, although prejudice is an attitude directed toward members of a group solely based on their membership in that group, the questions Professor Moran used to calculate prejudice do not reference a "social target" of the prejudicial attitude. (*See* McKnight Aff. at 2 (D.E. # 441 Ex. B).) Therefore, Professor Moran's calculation of prejudice is without substantial support, thus rendering it unreliable.

Third, in those questions in which a social target is mentioned, Professor Moran has done so in non-neutral terms characterizing actors subjectively, a method contrary to standard scientific procedure. (*Id.*) For example:

2. These defendants are charged with setting up the **ambush** of the Brothers to the Rescue planes in which four people were killed. This type of activity is characteristic of the Castro regime.

3. The aim of Castro is to **undermine legitimate** Cuban exile organizations.

5. Castro's **agents** have attempted to disrupt peaceful demonstrations such as the Movimiento Democracia's flotillas which **honor fallen comrades.**

(D.E. # 321 Ex. E at 2 (emphasis added).) Therefore, because Professor Moran failed to use neutral terminology, the questions

---

trict court also denied the defendants' motion for change of venue.

**5.** Professor McKnight is a social psychologist specializing in social perception, research methodology, and psychometrics. (D.E. # 441 Ex. B at 1.) He holds a Bachelor's degree in Psychology from the University of Illinois at Chicago, and a Master's degree and Ph.D. in Psychology from the State University of New York at Stony Brook. (*Id.*) He has completed a post-doctoral fellowship in Cardiovascular Behavioral Medicine—Psychophysiology at the Western Psychiatric Institute & Clinic, University of Pittsburgh Medical Center. (*Id.*) As of August 1997, he was a consultant with Zagnoli McEvoy Foley Ltd., in Chicago, Illinois. (*Id.*)

**6.** Professor McKnight's affidavit was previously offered in rebuttal to the defendant's reliance on Professor Moran's survey in support of the motion for change of venue in *Broder*. *See* note 4, *supra*. The Court has reviewed Professor Moran's prior survey, analysis and conclusions, and finds that there are substantial similarities with Professor Moran's analysis and conclusions in the survey in the case *sub judice*. For example, question 6 in the present survey ("Castro's Cuba is an enemy of the United States.") (D.E. # 321 Ex. E at 2) also appears in the *Broder* survey (question 5). (D.E. # 441 Ex. A at 11.) In addition, many areas of Professor Moran's analysis and conclusions in his affidavit in this case appear verbatim in the *Broder* affidavit.· (Compare D.E. # 321 Ex. A 7–9, 12–16 *with* D.E. # 441 Ex. A 8–10, 14–16.) Therefore, based on these similarities, the Court deems Professor McKnight's critique of the *Broder* survey equally applicable to Professor Moran's survey in this case.

in the survey cannot validly assess social prejudice.

Fourth, several of Professor Moran's questions are ambiguous, casting further doubt on the accuracy of the response provided. For instance, question 10 asks if there are "any circumstances" that would change the respondent's "opinion," but does not clarify to which opinion the question refers. (D.E. # 321 Ex. E at 2.)

Fifth, Professor McKnight pointed out in the *Broder* survey, the sample size of 250 respondent constituted less than 0.003% of eligible jurors in Miami–Dade County in 1992, and could not be considered representative of the population at that time. (McKnight Aff. at 4–5 (D.E. # 441 at 4–5).) Similarly, the size of the statistical sample in this case (300 respondents) is too small to be representative of the population of potential jurors in Miami–Dade County.

Finally, and most significantly, Professor Moran attempts to bolster his conclusion that community prejudice exists by referencing the earlier study of anti-Cuban sentiment in South Florida that was introduced in *Fuentes–Coba*, in which the district court concluded—and the Eleventh Circuit affirmed—that the survey *did not* give rise to a presumption of prejudice. *See Fuentes–Coba*, 738 F.2d 1191. Due to its ambiguity and lack of clarity and reliability, therefore, the Court is unwilling to give Professor Moran's survey substantial weight in determining whether Defendants are entitled to a change of venue. *See id.*

Based on the articles and Professor Moran's survey, Defendants portray their case as identical to the circumstances in *United States v. McVeigh*, 918 F.Supp. 1467 (W.D.Okla.1996), in which Judge Matsch granted a change of venue to Colorado for the trial of the Oklahoma City bombers. In granting the defendants' motion—which the Government did not oppose—Judge Matsch emphasized the strong judicial preference for careful voir dire and noted that extensive pre-trial publicity does not *per se* preclude a finding of fairness in the conduct of the trial. *Id.*

at 1470, 1473. Because of: (1) the demonization of the defendants in contrast to the intense humanization of the victims; (2) the character of the crimes charged; and (3) the "profound and pervasive" effects of the explosion such "that no detailed discussion of the evidence [was] necessary," Judge Matsch concluded that there was "so great a prejudice against [the] two defendants in the State of Oklahoma that they [could] not obtain a fair and impartial trial" anywhere in the state. *Id.* at 1474.

The volume and character of the evidence justifying a change of venue in *McVeigh* far outweighs the evidence Defendants have submitted in support of their argument that pervasive community prejudice exists in this case. *See McVeigh*, 918 F.Supp. at 1470 (evidence submitted included, *inter alia*, videotapes of local and national telecasts from the date of the bombing to the date of the motions hearing). Thus, while the pretrial atmosphere in Oklahoma City was more akin to that of the *Irvin* trial, this case is substantially similar to that in *Ross* or *Fuentes–Coba*, in which the pretrial publicity did not rise to a sufficient level to raise a presumption of prejudice in the community. *See Fuentes–Coba*, 738 F.2d at 1194; *Ross*, 716 F.2d at 1541. Thus, the Court finds that Defendants have not adduced evidence sufficient to raise a presumption of prejudice against Defendants as would impair their right to a fair trial by an impartial jury in Miami–Dade County. *See Fuentes–Coba*, 738 F.2d at 1194–95; *Ross*, 716 F.2d at 1541.

### III. Conclusion

The Court finds that Defendants have not demonstrated the degree of pervasive community prejudice which would warrant a presumption of jury prejudice, and that thorough voir dire, conducted in a manner similar to *Ross*, 716 F.2d at 1540, and *Fuentes–Coba*, 738 F.2d at 1194–95, and careful instructions to the jury throughout trial will enable the Court to safeguard Defendants' right to a fair and impartial

jury in Miami–Dade County. In addition, the Court notes that if the Court determines during voir dire that a fair and impartial jury cannot be empaneled, Defendants may renew this Motion and the Court shall consider a potential change of venue at that time. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants' Motions for Change of Venue (D.E.# 317, 321, 329) are **DENIED WITHOUT PREJUDICE.** It is further

**ORDERED AND ADJUDGED** that counsel for the Government and counsel for Defendants shall have up to and including August 21, 2000 to file with the Court any proposed voir dire questions.