TORRUELLA, Circuit Judge
(Dissenting).
“ ‘[Rjegardless of the heinousness of the crime charged, the apparent guilt of the offender[,] or. the station in life which he occupies,’ our system of justice demands trials that are fair in both appearance and fact.” Skilling v. United States, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010) (Sotomayor, J., concurring in part and dissenting in part) (quoting Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). The actions taken by this court today pave the way for a trial that is fair neither in fact nor in appearance.
*30 The press coverage of this case — beginning with the bombing itself and the subsequent manhunt culminating with the sheltér-in-place order, continuing thereafter with stories of the victims, Boston’s coming together and healing as one united city, and the coverage of the pretrial events — is unparalleled in American legal history. Given the impact of the bombing and subsequent press coverage on the entire city, it is absurd to suggest that Tsarnaev will receive a fair and impartial trial in the Eastern Division of the District of Massachusetts. There is no sound basis for refusing to apply a presumption of prejudice to a high-profile, omnipresent, emotionally-charged case like this — particularly where the entire Boston community has been terrorized, victimized, and brutalized by such a horrendous act of violence. No amount of voir dire can overcome this pervasive prejudice, no matter how carefully it is conducted.
The whole world is watching to see how the American legal system treats Tsarnaev, even if he is allegedly the most dreadful of defendants. Every move taken is scrutinized to see if the bedrock American rights of “innocent until proven guilty” and the “right to a fair trial by an impartial jury” are given to a foreign-born defendant accused of terrorism — among the most heinous of crimes. Unfortunately, both the district court and majority fail to uphold these rights, and this failure damages the credibility of the American judicial system.
I do not dispute that “[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations.” Kerr v. U.S. Dist. Court for N. Dist of Cal., 426 U.S. 394, 402, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). But in my forty years on the bench, both as a trial judge and as an appellate judge, I am unaware of a situation more “extraordinary” than this one. The district court has demonstrated a clear abuse of discretion. Contrary to the district court’s assessment and the decision of the majority today, mandamus relief is not only appropriate, but also necessary-to assure that Tsarnaev receives the fair trial that is mandated by our Constitution. Therefore, for the reasons explained herein, I respectfully — but vehemently— dissent.
I. Background[20]
On April 15, 2013, two bombs exploded near the finish line of the Boston Marathon on Boylston Street in downtown Boston. Three people were killed and approximately 264 others were injured. Countless others ran from the scene in terror. Over the next four days, a massive manhunt for those responsible ensued. On the third day, April 18, authorities released video surveillance and photos of the suspects: Tamerlan and Dzhokhar Tsarnaev. That night, while the brothers were trying to flee Boston, they allegedly carjacked an SUV and killed an MIT police officer. In a subsequent shootout with police, Tamerlan Tsarnaev was seriously injured. Dzhokhar Tsarnaev (hereinafter, “Tsarnaev”) was able to temporarily escape, in part by allegedly driving over his' brother.
Finally, on April 19, the search had narrowed to the Boston suburb of Watertown. In an unprecedented move, authorities called for a “shelter-in-place” advisory, ef *31 fectively placing the city in lockdown: residents in Watertown and the surrounding areas — Boston proper, Cambridge, Newton, Belmont, and Waltham — were ordered not to leave their homes. The T (Boston’s public transportation system) was shut down, as were most businesses and public offices. While residents were confined to their homes, FBI agents, local police officers, and SWAT team members went door-to-door in a twenty-block radius of Watertown searching for Tsarnaev. Hours later, he was found hiding in a boat in a resident’s backyard. Tsarnaev was bloodied from a firefight with authorities and had written a note on the boat claiming that “[w]hen you attack one Muslim, you attack all Muslims” and that the Marathon victims were collateral damage.[21] Immediately upon his arrest, Boston May- or Thomas Menino tweeted “We got him”; the Boston Police Department tweeted “CAPTURED!!! The hunt is over. The search is done. The terror is over. And justice has won.”[22] Meanwhile, Water-town residents “flooded the streets, cheering every passing police car and armored vehicle in an impromptu parade” and residents “danced in the streets outside Fen-way Park.”[23]
Most — if not all — of this four-day ordeal was shown live on television and reported real-time on the internet. Print newspapers, meanwhile, published daily recaps of the previous day’s events, including the pictures of a bloodied Tsarnaev.[24]
Over the next few weeks, nationwide coverage continued, slowly dwindled, and, with the exception of the occasional story here-and-there, eventually ended. In Massachusetts, however, the story did not end. Instead, the local news (both television and print) continued to cover all the details of the bombing and its aftermath. The reporting focused not only on Tsarnaev, but on the city as a whole. Coverage included stories of the victims and their family and friends, those who bravely risked their lives to help the victims, and how the entire community came together.[25] *32 This phenomenon and sentiment were embodied in the “Boston Strong” campaign which “rallied a city,” became “shorthand for defiance, solidarity, and caring,” and “presented] a unified front in the face of [a] threat.”[26] Indeed, one could not go anywhere in Boston in the bombing’s aftermath without seeing the slogan on a car, t-shirt, bracelet, tattoo, or even mowed into the outfield of Fenway Park. It spurred concerts, fundraisers, and rallies throughout the' city. A website, onefundboston.org, was also formed “with the purpose of helping those most affected by the tragic Boston Marathon bombings” by raising money and providing a forum to “gather[ ]. encouraging stories of strength, recovery, and hope from survivors.”
These stories and the “Boston Strong” campaign continue to this day, almost two years later. Just over four weeks ago, as Boston was slammed with a massive blizzard leaving approximately two feet of snow, a man took it upon himself to shovel the finish line of the Marathon. This man was referred to by many in the community as a “hero” and a “snowmaritan,” and led to the viral “# WhoShoveledTheFinishLine” hashtag on social media.[27] And as this ease has proceeded, a dump truck has parked outside the courthouse bearing a “Boston Strong” logo and a building currently being constructed across the street from the courthouse has hung a “Boston Strong” banner.
There is no doubt that Boston has, quite laudably, emerged from this attack stronger and more united than it was before. However, these events also show that Boston has not yet fully recovered, and that every resident — whether or not they were at the marathon that day, knew a victim, or were subject to the shelter-in-place order [28] — was deeply and personally affected by the tragedy.
We are now tasked with deciding whether the effects of these tragic events and the unrelenting media coverage that followed and continues to this day have affected Tsarnaev’s constitutional right to a trial by a jury that is fair, impartial, and indifferent, and if so, whether we should apply our mandamus power to intervene.
II. Discussion
Courts throughout the country have found mandamus to be an appropriate, albeit rarely implemented, vehicle to challenge a district court’s change-of-venue decision. See, e.g., In re Volkswagen of Am., Inc., 545 F.3d 304, 308-09, (5th Cir.2008); Matter of Balsimo, 68 F.3d 185, 187 (7th Cir.1995); In re Briscoe, 976 F.2d 1425, *33 1429 (D.C.Cir.1992); United States v. McManus, 535 F.2d 460, 464 (8th Cir.1976).[29] As in all mandamus cases, a petitioner must establish the following before the writ will issue: (1) that his “ ‘right to issuance of the writ is clear and indisputable’ (2) that he “has no other adequate source of relief; that is, he must show ‘irreparable harm’ ”; and (3) that “on balance, the equities favor issuance of the writ.” In re Bulger, 710 F.3d 42, 45 (1st Cir.2013) (quoting Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367, 381, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) and In re Vázquez-Botet, 464 F.3d 54, 57 (1st Cir. 2006), respectively). Tsarnaev is the rare litigant who has satisfied all three requirements.
A. Tsarnaev Is Entitled to a Change of Venue
While Article III of the Constitution provides that criminal trials “shall be held in the State where the said Crimes shall have been committed,” U.S. Const, art. Ill, § 2, cl. 3, that requirement is far from absolute. The Sixth Amendment requires that the trial take place “by an impartial jury of the State and district wherein the crime shall have been committed,” U.S. Const, amend. VI (emphasis added), and the Fifth Amendment’s Due Process Clause requires fundamental fairness in trials, see U.S. Const, amend. V. See also Skilling, 561 U.S. at 378-79, 130 S.Ct. 2896; United States v. McVeigh, 918 F.Supp. 1467, 1469 (W.D.Okla.1996). To that end, Rule 21 of the Federal Rules of Criminal Procedure requires that a “court must transfer the proceeding against the defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.” Fed. R.Crim.P. 21(a).
1. A Presumption of Prejudice Exists Which Cannot Be Overcome
“In determining whether sufficient prejudice exist[s] to require a change of venue, we must conduct two inquiries: 1) whether jury prejudice should be presumed given the facts before us; or 2) if prejudice should not be presumed, whether the jury was actually prejudiced.” United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir. 1990). Here we are dealing with the first inquiry. There are two ways in which prejudice can be presumed. First, “prejudice may properly be presumed where ‘prejudicial, inflammatory publicity about [a] case so saturated the community from which [the defendant’s] jury was drawn as to render it virtually impossible to obtain an impartial jury.’ ” Id. (quoting United States v. McNeill, 728 F.2d 5, 9 (1st Cir. 1984) (alterations in the original). The publicity “must be both extensive and sensational in nature.” Id. Second, it can also be shown when “so many jurors admit to a disqualifying prejudice that the trial court may legitimately doubt the avowals of impartiality made by the remaining jurors.” United States v. Rodríguez-Cardona, 924 F.2d 1148, 1158 (1st Cir.1991). When prejudice is presumed, “no inquiry need be made as to the actual effect of the publicity *34 on the petit jury.” United States v. Brien, 617 F.2d 299, 313 (1st Cir.1980) (citing Sheppard v. Maxwell, 384 U.S. 333, 352-55, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)). Regardless of which route is taken, Tsarnaev has established a presumption of prejudice.
As to the first, there is little doubt in my mind that the pretrial publicity — which has been pervasive, prejudicial, and inflammatory — has so saturated the Eastern Division of the District of Massachusetts and persists to this day such that we must presume Tsarnaev cannot obtain a fair and impartial trial here. As explained above, the city of Boston[30] was itself victimized, and the coverage of the attacks and the ensuing manhunt was shown live on television and the internet for four days. I expect most people were following it intently, especially those in Boston and Watertown who were locked in their homes unable to do much else. The spectacle of seeing a bloodied Tsarnaev taken out of the boat and arrested is not something a potential juror in the Eastern Division of the District of Massachusetts can easily forget or put aside; nor can one easily forget Tsarnaev’s subsequently released alleged “confession,” claiming that all of the victims were collateral damage. These images, which may have been shown once or twice nationwide, were shown repeatedly in Massachusetts.[31] As the Supreme Court acknowledged in Rideau v. Louisiana, “[f]or anyone who has ever watched television[,] the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense” was the actual trial. 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (finding change of venue was required where a twenty minute jail house “interview” was aired on television for three consecutive days). For the people of the Eastern Division of the District of Massachusetts, “a community so pervasively exposed to such a spectacle,” “[a]ny subsequent court proceedings ... could be but a hollow formality.” Id.; see also Irvin, 366 U.S. at 719-20, 81 S.Ct. 1639 (requiring change of venue where six murders were “extensively covered by news media in the locality, aroused great excitement and indignation” in the area, and involved “officials issuing] press releases, which were intensively publicized, stating that the petitioner had confessed”); Brien, 617 F.2d at 313 (transferring one defendant to Springfield, Massachusetts and another to Arizona in a mail and wire fraud case where most investors lost everything because the “sensational activities of [the defendant corporation] precipitated extensive critical comment in the press in New England and the Eastern seaboard” and “the possible effect of that publicity on the defendants’ right to a fair trial” required a change of venue). This is especially true here, where the vast majority of the prospective jurors have personal connections to the events.
One reaches the same conclusion under the second analytical route, which involves examining the jury selection to date. “[T]he ‘length to which the trial court must go in order to select jurors who appear to *35 be impartial’ ” can also “support a presumption of prejudice.” Angiulo, 897 F.2d at 1181 (quoting Murphy v. Florida, 421 U.S. 794, 802, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)). Here, the district court summonsed 1,373 jurors and required them to fill out a 101-question questionnaire which explored, among other things: their backgrounds; their personal connections to Boston, the Marathon, the bombings, and the victims; their views on Tsarnaev’s innocence; and their views on the death penalty. These prospective jurors were divided into six jury panels and, assuming they were not struck for cause based solely on the questionnaires, were then subject to individual voir dire by the district court and the parties. On Wednesday, February 25, 2015, the twenty-fourth day of jury selection, seventy-five jurors were provisionally qualified.[32] The reason for this lengthy process is the pervasive prejudice permeating throughout the pool. To get a sense of the kinds of views that are representative of both the jury pool and the community, I include below a mere sample of the comments that have been made by' prospective jurors, broken into three categories — the prospective jurors’ views on Tsarnaev’s guilt, their personal connections to the bombings, and their exposure to publicity about the case:

Prospective Jurors’ Views on Tsarnaev’s Guilt

• “[H]ow could I possibly find the defendant not guilty with all the news information. I have trouble accepting him getting housing & living assistance from the state of MA, education without paying, taking the oath of citizenship and then committing crimes against innocent everyday people who are also citizens of USA. Not to mention taxpayers]]] $ $ $”
• “He does not deserve a trial.”
• “Caught redhanded should not waste the $ on the trial.”
• “[T]hey shouldn’t waste the bulits [sic] or poison; hang them.”
• “[W]e all know he’s guilty so quit wasting everybody’s time with a jury and string him up.”
• “People told me the defendant is overwhelmingly guilty.”
• “[M]ost commented on the fact that we should skip the trial & go right to sentencing b/c of the assumed guilt of the heinous crimes that he’s accused of.”
• “[It’s] hard to understand how someone can defend a murderer.”
• “I have formed the opinion that a convicted terrorist should receive the death penalty. They’re the enemy of my country.”
• “Yeah, I think when I first checked the guilty [box], you know, if I felt that he was guilty box, I realized after, I don’t know what all the charges are, so I can’t know that he’s guilty, because I don’t know what the charges are or what the evidence is and all of that. But I think that there’s involvement. There was so much media coverage, even just the shootout in Watertown. I watched it on TV. And so I feel like there’s involvement there, like I think it’s — anybody would think that.”
• The juror’s knowledge of graphic pictures, “especially the little boy,” would affect the juror’s ability to serve because the juror “ha[s] a son.”
*36 • “I truly believe that in a sense that [the death penalty] could be the easy way out for the defendant. He could may [sic] want that. So that’s why I said that. But as far as this next part, again, at the time I said — I thought about it a lot since I did this questionnaire. I don’t know if I would be able to say he’s not guilty. I think, no matter what, he’s guilty, no matter what. As far as the death penalty, though, I still — I wouldn’t have an issue, you know, agreeing to the death penalty, but, yeah, it’s the easy-way-out thing. I’m not sure, that’s the main thing for me.”
• “[F]or this case I think a public execution would be appropriate, preferably by bomb at the finish line of the marathon.”
• When the prospective juror’s coworkers heard she might be picked for this trial, “[t]hey basically said, ‘Fry him.’ “
• “I haven’t heard both sides of the story, but on the other side, I’m supposed to hear the not guilty side louder first than the guilty side. So I guess I should be going in with an assumption of not guilty, but I’m not.”

Prospective Jurors’ Personal Connections to the Bombings

• “You don’t [sic] want to' know [what I thought when I received my summons]! I have close friends that work the emergency room at MA General! What I really thought? We give you home, money eduat [sic] & this is how you pay us back? I’m sorry I’m all for the death penity [sic] on this — my friends still have nightmare [sic] of that day! ”
• “I think we all were effected [sic] by the death of that little boy (Martin) from Dorchester.”
• “It does [affect my ability to be fair and impartial]. The Boston Strong bumper sticker ... represents to me the way the city came together and helped, and just show[s] the unity of Boston.... ”
• “We know many people that ran and watched the marathon that day so it was always being discussed.”
• “I knew 11 people running that day.”
• “I feel anyone near the Boston area was effected [sic] by this event.”
• “My children were horrified, and even when we thought things were under control, we went into lock-down. It was a horrible week of fear, anger, confusion that we lived through.”
• One prospective juror could not put aside a belief that Tsarnaev was guilty because a close friend who was at the Marathon’s finish line has had to undergo “multiple surgeries” to her leg
• due to shrapnel from one of the bombs.

Prospective Jurors’ Exposure to Publicity About the Case

• “Well, I read the paper every day, and I watch the news two hours every day. So over the course of the past year, I’ve obviously seen and read and heard quite a bit.”
• “My husband and I watched the events on TV [live], including lockdown and capture — it was very upsetting, traumatizing, made you feel not safe in your own ‘back yard.’ ”
• “It’s kind of like saying erase everything you have in your head from something. I don’t know that I would be able to erase my memory of everything that I’ve read, seen, and heard.”
• “Absolutely. How could you not [have followed events during the week of the bombing].”
*37 • “I remember seeing some raw footage that day which I’ll never forget. Yeah, there was a lot going on that day, and it really struck me deeply.”
• “Well, I mean, from seeing and seeing all the evidence that was publicly available, you know, and the having all the casualty that occurred during that, yes, I feel that he is guilty, and I think the punishment should be, you know, death, because personally I think that this is something that — I feel takes a greater weight as 9/11, you know, where there were so many lives affected, you know, with, you know, legs or whatnot, you know, that they live every single day now....”
• “I think there’s a lot [of concern about the media arrangement], there were questions and there’s a lot of conversation, and if you were a potential juror, you’d need to be avoiding the media, and it’s so front and center, it’s difficult. And, you know, just even driving in the car, the news comes on, and, you know, I’ve heard, you know, you try to switch it, but you hear things.... ”
• “In terms of the feelings on guilt, I think that just comes from the initial things in the news when the event happened and seeing all that. So that’s kind of formed that perspective.”
• “Actually, I think I could be fair, but I do have this image in my mind that I can’t deny, to be perfectly honest.... The image of him putting the backpack behind that little boy.”
After reading these comments, it is clear to me that the jury pool is not composed of unbiased, indifferent individuals.[33] This should come as no surprise — the attitudes of the jury pool, as evidenced by statements like those excerpted above, reflect the understandable and altogether human reaction of neighbors traumatized by the horrific violence inflicted upon them and their entire community. Indeed, in no small part and in very real terms, the members of the jury pool were themselves victims of the perpetrators’ chilling act of terror. Acknowledging that fact is by no means an indictment of the jury pool or the people of Boston, who have shown such courage and resilience in the face of tragedy and terror. While we may thus understand and empathize with the prospective jurors’ reaction, such empathy and understanding cannot convert a biased jury pool into a constitutionally impartial jury of Tsarnaev’s peers. Rather, our duty as honest arbiters requires us to uphold the Constitution and to ensure that those strong feelings shared by the greater Boston community do not deny Tsarnaev his right to a fair trial. If the particular facts and circumstances of this case — together with the emotionally — charged comments of the jury pool excerpted above — do not establish a presumption of prejudice, it is hard to fathom what would.
This prejudice is only highlighted and magnified by the surroundings in which jury selection is occurring. Each day, when jurors report to the John Joseph Moakley United States Courthouse, they cannot help but observe an overwhelming *38 display of official government force. A secure perimeter has been established for several blocks in each direction of the Courthouse; authorized vehicles may be admitted, but only after first being inspected by bomb-sniffing dogs. Anyone who makes it past the perimeter must then navigate crowd-control barriers, only to then be greeted by a phalanx of armed Federal Protective Service officers standing guard at the entrance to the Courthouse. Meanwhile, the roads are lined with Boston Police cars, Department of Homeland Security vans, and vehicles from the U.S. Marshals Service. Upon entering the Courthouse, if one looks out past the garden to the Inner Harbor, one sees that at least two U.S. Coast Guard “Defender” Class Small Response Boats, each armed with a high caliber machine gun, are patrolling the waters behind the Courthouse.
It likely goes without saying that much of this security dissipates when Tsarnaev is not in court. While I cannot evaluate whether such security is actually necessary or reasonable, the impression it gives off is clear: the proceedings in this case are taking place in a fortress-like atmosphere because Tsarnaev must be extraordinarily dangerous. As a result, prospective jurors are inundated with the message that Tsarnaev is a threat who requires the full force of the U.S. Military and civilian security apparatus in response. I do not fault the many security personnel for doing their duty; nor do I fault their superiors for taking precautions regarding the security of the court. Still, I am troubled by how such a conspicuous show of force outside the Courthouse may influence the proceedings within it, especially to a jury pool already so deeply affected by the events. Many of those previously traumatized by the shelter-in-place order and area-wide manhunt might understandably relive that trauma when triggered by such a similar show of force. This is especially true considering the Marathon’s finish line is only mere miles from the situs of the these proceedings and that the two-year anniversary of the bombing will take place in the middle of Tsarnaev’s trial.
The government, district court, and majority see things differently. In rejecting Tsarnaev’s third motion for a change of venue, it points to the jurors already qualified, concluding that the initial questionnaires and individual voir dire have done their job to effectively weed out prejudiced jurors and allow the court to find impartial jurors. But, under these unique circumstances, it strains credulity to assume that mere questionnaires and voir dire can effectively weed out biased residents and find seventy-five qualified jurors who are impartial and indifferent. As the Supreme Court explained in Irvin:
No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one’s fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, “You can’t forget what you hear and see.”[34]
366 U.S. at 728, 81 S.Ct. 1639. The District Court for the Western District of Oklahoma made a similar point in McVeigh:
The existence of ... prejudice is difficult to prove. Indeed it may go unrecognized in those who are affected by it. The prejudice that may deny a fair trial *39 is not limited to a bias or discriminatory attitude. It includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence.
918 F.Supp. at 1472. We echoed that sentiment in Angiulo:
Where a high percentage of the venire admits to a disqualifying prejudice, a court may properly question the remaining jurors’ avowals of impartiality, and choose to presume prejudice.
897 F.2d at 1181-82. Indeed, in comparable cases of such severe and pervasive prejudice, the Supreme Court found that there was no need “to examine a particularized transcript of the voir dire examination of the members of the jury.” Rideau, 373 U.S. at 727, 83 S.Ct. 1417; cf. United States v. Moreno Morales, 815 F.2d 725, 735 (1st Cir.1987) (finding no presumption of prejudice where twenty-five percent of the venire admitted believing that the defendants were guilty).
Finally, even if it were possible to overcome the presumption of prejudice and find truly impartial and unbiased jurors, these jurors would certainly not be “indifferent,” as almost every prospective juror has some connection to the events. See Irvin, 366 U.S. at 722, 81 S.Ct. 1639 (“The-right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, ‘indifferent’ jurors.”). Nor would they be representative of either the jury pool as a whole or the community at-large. See id. at 727, 81 S.Ct. 1639 (“Here the ‘pattern of deep and bitter prejudice’ shown to be present’throughout the community was clearly reflected in the sum total of the voir dire examination of a majority of the jurors finally placed in the jury box.... With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man.” (internal citations omitted)).
There is no doubt in my mind that the circumstances surrounding this case— which, it cannot be emphasized enough, is a death penalty case — create a presumption of prejudice. I have seen nothing in either the questionnaires or the voir dire to suggest otherwise. Indeed, the government is unable to point to a single instance in any of the 463 criminal jury cases heard in this Circuit (188 of which were in the District of Massachusetts) in the past five years where statements made during jury selection came even close to approximating the quite understandable level of bias, hate, disgust, and outrage manifested by so many of the prospective jurors here. For all these reasons, the district court’s decision to thrice deny Tsarnaev’s motion for a change of venue is a clear abuse of discretion.

2. This Case Is Comparable to McVeigh, Rideau, and Irvin

It is extremely disappointing that both the district court and the majority fail to appreciate the similarities to United States v. McVeigh, 918 F.Supp. 1467 (W.D.Okla. 1996), and the other cases cited by Tsarnaev. McVeigh concerned the trial of those responsible for the Oklahoma City bombing which killed 168 people, injured hundreds more, completely destroyed the Alfred P. Murrah Federal Office Building, and damaged many other buildings, including the federal courthouse. Id. at 1469. In McVeigh, the parties agreed that venue had to be moved outside of Oklahoma City because “[t]he effects of the explosion on that community are so profound and per *40 vasive.”[35] Id. at 1470. The dispute was over whether to keep the trial in Oklahoma, specifically Tulsa, or to move it to Denver. Id. at 1470,1474.
The court concluded “that there is so great a prejudice against these two defendants in the State of Oklahoma that they cannot obtain a fair and impartial trial at any place fixed by law for holding court in that state.” Id. at 1474 (emphasis added). Specifically, the district court relied on the following factors. First, while initially there was “extremely comprehensive” national media coverage, “[a]s time passed, differences developed in both the volume and focus of the media coverage in Oklahoma compared with local coverage outside of Oklahoma and with national news coverage.” Id. at 1470-71. While national coverage dwindled, local coverage continued for months after the explosion and focused on “more personal” coverage “of the victims and their families” and of “individual stories of grief and recovery.” Id. at 1471. Second, “Oklahomans [were] united as a family with a spirit unique to the state. Indeed, the ‘Oklahoma family’ ha[d] been a common theme in the Oklahoma media coverage, with numerous reports of how the explosion shook the entire state, and how the state ha[d] pulled together in response.” Id. Third, “[t]he possible prejudicial impact of this type of publicity [wa]s not something measurable by any objective standards.” Id. at 1473.
These considerations are identical to those in the present case.[36] As described above, the ongoing Massachusetts coverage has been significantly more in-depth and personal than the national coverage which has, for the most part, been sporadic and general. Moreover, like the “Oklahoma Family” slogan, “Boston Strong” has taken hold (and continues to be used) throughout Massachusetts.[37] And, as the media reports, juror questionnaires, and voir dire make clear, there is strong prejudice amongst prospective jurors, the full extent of which is almost impossible to gauge.
Four other eases are also worth mentioning. In Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the defendant was arrested and charged with bank robbery, kidnapping, and murder. Id. at 724, 83 S.Ct. 1417. Following his arrest, he was “interviewed” by the *41 country sheriff and allegedly admitted his guilt. Id. For three consecutive days, the recording of this “interview” was broadcast on television and was seen by an estimated 97,000 people (or approximately 65% of the Calcasieu Parish). Id. In reversing the defendant’s conviction, the Supreme Court explained that
it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail.... For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau’s trial.
Id. at 726, 88 S.Ct. 1417. The repeatedly broadcast image of Tsarnaev being taken from a boat, covered in blood from a firefight with police — an image which was quite likely seen by nearly 100% of the Eastern Division of the District of Massachusetts population[38] — is just as damaging a “confession” and spectacle, particularly when paired with the incriminating and incendiary statements allegedly written by him in the boat.
Similarly, in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the defendant was-charged with murdering six individuals near Evansville, Indiana in a four-month span. Id. at 719, 81 S.Ct. 1639. Shortly after his arrest, “officials issued press releases, which were intensively publicized, stating that the petitioner had confessed to the six murders.”[39] Id. at 719-20, 81 S.Ct. 1639. In requiring a change of venue, the Supreme Court noted that the “build-up of prejudice is clear and convincing.” Id. at 725, 81 S.Ct. 1639. It pointed to the “then current community pattern of thought” and the “curbstone opinions, not only as to petitioner’s guilt but even as to what punishment he should receive,” which were solicited and broadcast over local stations. Id. The tweets by Mayor Menino and the Boston Police Department, the opinions expressed in the local media, the surveys of Massachusetts residents as to their views on the case, and the prospective jurors’ comments (some of which are detailed above) are analogous to the same kind of prejudicial actions found to be impermissible when they occurred in Evansville in connection with Irvin.[40]
*42 Finally, venue challenges were raised in the state court trials of both Lee Boyd Malvo and John Allen Muhammad — better known as the Beltway Snipers who terrorized Virginia, Maryland, and Washington, D.C. in late 2002. Though the procedural postures and media coverage are not identical to the present case, it is telling that their trials were moved over 200 miles away from the site of the attacks to ensure they, too, would receive fair trials.[41]
In all of these cases, each involving the death penalty and three involving similar acts of terrorism,[42] a change of venue was abundantly appropriate. It is likewise appropriate here. The district court’s failure to transfer is a clear abuse of discretion.
3. This Case Is Not Comparable to Skilling
The government, district court, and majority, however, all disagree and equate this case to United States v. Skilling, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). This comparison is inapposite. Unlike the cases just described, Skilling involved neither terrorism nor murder, and it certainly did not involve the death penalty. Instead, Skilling involved the trial of one of the former CEOs of Enron— one of the world’s leading energy companies at the time — which collapsed and fell into bankruptcy in 2001 amid fraud. Id. at 368, 130 S.Ct. 2896. “[T]he facts of the case were ‘neither heinous nor sensational.’ ” Id. at 369, 130 S.Ct. 2896.
*43 After being indicted on numerous counts of -wire fraud, securities fraud, insider trading, making false representations to auditors, and conspiracy to commit fraud— of which he was convicted of some charges and acquitted of others — Skilling appealed, arguing that his trial should have been moved outside of Houston. Id. at 375-76, 130 S.Ct. 2896. The Supreme Court rejected this argument due to a number of factors, all of which are readily distinguishable here.
First, it explained that Houston is “the fourth most populous city in the Nation.” Id. at 382, 130 S.Ct. 2896. Boston is not even in the top twenty. See U.S. Census Bureau, Annual Estimates of the Resident Population for Incorporated Places of 50,-000 or More, Ranked by July 1, 2018 Population: April 1, 2010 to July 1, 2018, May 2014, http://factfinder.census.gov/ faces/tableservices/jsf/pages/productview. xhtml?src=bkmk. Moreover, the Skilling Court noted that in a survey of potential jurors commissioned by Skilling, “only 12.3% of Houstonians named [Skilling] when asked to list Enron executives they believed guilty of crimes”; “two-thirds of respondents failed to say a single negative word” about Skilling; and “43% either had never heard of Skilling or stated that nothing came to mind when they heard his name.” 561 U.S. at 382 n. 15, 130 S.Ct. 2896. Here, by contrast, Tsarnaev notes that 94% of potential jurors who filled out a questionnaire had been exposed to “moderate” or “a lot” of publicity. Independent news articles report similar findings.[43] Unlike in Skilling, where it was possible to know about the Enron scandal without knowing that Skilling was personally involved, Tsarnaev and the Boston Marathon bombings are one and the same; it is impossible to be aware of one and not the other.
Second, the Skilling Court examined the pretrial publicity and emphasized that “although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.” Id. at 382, 130 S.Ct. 2896. It added that the “[p]retrial publicity about Skilling was less memorable and prejudicial” and that there was “[n]o evidence of the smoking-gun variety [which] invited prejudgment of his culpability.” Id. at 383, 130 S.Ct. 2896. Here, by contrast, in the midst of the manhunt, the media showed surveillance video of Tsarnaev with a backpack moments before the bombing, plastered Tsarnaev’s photograph everywhere imaginable, and broadcast live the scene of him being found hidden in a boat, covered in blood, and his subsequent arrest. Further reports over the next few weeks and months revealed his note written inside the boat, which was described by many as a “confession.” [44] And less than five weeks ago, on *44 the morning jury selection began, the media reported that Tsarnaev offered to plead guilty in exchange for the government removing the death penalty but that the government rejected the offer.[45] Thus, unlike in Skilling, here there is blatantly prejudicial pretrial publicity. This fact directly cuts against the government’s argument that there “have been no reports of a criminal history, of an offer to plead guilty, of a confession to other crimes, or of damaging last-minute admissions.”
Third, the Skilling Court explained that “over four years elapsed between Enron’s bankruptcy and Skilling’s trial” and that “the decibel level of media attention diminished somewhat in the years following Enron’s collapse.” Id. at 383, 130 S.Ct. 2896. As explained above, it has been less than two years since the Marathon bombing, and while the level of media attention has diminished somewhat, it is still extremely strong and prevalent, especially in Massachusetts.[46] The emotional salience of these ongoing reports cannot be overstated.
Fourth, the Court rejected Skilling’s argument that the “sheer number of victims” triggered a presumption of prejudice because the “jurors’ links to Enron were either nonexistent or attenuated.” S'killing, 561 U.S. at 384,130 S.Ct. 2896. While many people in Houston had links to Enron or the energy sector, many also had no connection. See United States v. Skilling, 554 F.3d 529, 560 n. 47 (5th Cir.2009), aff'd in part, vacated in part, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010) (“Skilling offered opinion polls suggesting that one in three Houston citizens ‘personally knfejw’ someone harmed by what happened at Enron.”). This situation is different. It is true that a number of Eastern Division of the District of Massachusetts residents were not at the Marathon, did not know anyone at the Marathon, or were not personally subject to the shelter-in-place order. Still, they were nevertheless affected because the entire city of Boston was the intended victim of the bombings.[47] That is the whole point of terrorism — not just to kill or injure a few innocent people, but to make everyone scared and make everyone believe it could have been them or that they could be next. To further the point, it took just one day to qualify thirty-eight prospective jurors in Skilling. Skill *45 ing, 561 U.S. at 374,130 S.Ct. 2896. Here, it took eleven days to qualify forty-one.
Finally, the Supreme Court agreed with Skilling that a co-conspirator’s “well-publicized decision to plead guilty shortly before trial created a danger of juror prejudice,” but found that any prejudice was lessened due to the district court granting a continuance and addressing the issue during voir dire. Id. at 384-85, 130 S.Ct. 2896 (internal quotations marks omitted). Once again, the situation could not be more different here. In the midst of jury selection, three relevant events have occurred: the Charlie Hebdo shooting and manhunt in Paris,[48] the Finish Line “Snowmaritan,”[49] and the guilty plea of Khairullozhon Matanov — a friend of Tsarnaev who is accused of destroying evidence related to this investigation.[50] Unlike in Skilling, the district court has refused to delay the proceedings by even a day,[51] and a review of the questionnaires and voir dire reveals that whether these topics have had any prejudicial affect on the jury has not been deeply probed.[52]
4. If Not Here, When?
If a change of venue is not required in a case like this, I cannot imagine a case where it would be. The entire city of Boston has been terrorized and victimized, and deep-seated prejudice against those responsible permeates daily life. If residents of the Eastern Division of the District of Massachusetts did not already resent Tsarnaev and predetermine his guilt, the constant reporting on the Marathon bombing and its aftermath could only further convince the prospective jurors of his guilt. Adding the death penalty element to these circumstances, and the makings for a presumption of prejudice abound. If a presumption does not exist here, when would it? How big must a terrorist attack be? How numerous and widespread must the body count and impact be? How pervasive and detailed must the coverage be before a federal court must presume the existence of prejudice?
By refusing to grant a change of venue in this case — one of the most well-known, well-publicized, and emotionally-resonant *46 terrorist attacks ever to go to trial — both the district court and the majority are suggesting that there could never be a case which mandates a change of venue. If their decisions are allowed to stand, we might as well erase Rule 21(a) from the Federal Rules of Criminal Procedure, some of the due process principles from the Fifth Amendment, and the “impartial jury” phrase from the Sixth Amendment.[53]
B. A Failure to Act Will Cause Irreparable Harm
The second requirement for a writ of mandamus to issue is that a defendant must show “relief is necessary to prevent irreparable harm.” In re Justices of the Supreme Court of P.R., 695 F.2d 17, 20 (1st Cir.1982). This requirement has been satisfied here as well. Should the jury selection process fail to select a fair and impartial jury, the “widespread public comment” in a case of this magnitude would “creat[e] additional difficulty in beginning again at another place for trial.” McVeigh, 918 F.Supp. 1467. Any subsequent jury would be exposed to even more prejudicial publicity about the case. For example: it would be exposed to the daily events of the first trial; it would be exposed to the testimony given by the victims, the witnesses, and the experts; and it would be exposed to all the evidence presented by the government. Not only would it be exposed to this evidence, it would be exposed to outside commentary on the evidence as well. But, perhaps most harmfully, a subsequent jury could be expected to know that the new trial was the result of a post-conviction reversal. Thus, the new jury would know that Tsarnaev had already been convicted by a prior jury, with his guilt already proven once beyond a reasonable doubt. The jury might likely conclude that the retrial is due only to a perceived “technicality,” and as a result, any pretrial prejudice may be even stronger at a retrial. While this is, of course, a concern in any situation where a conviction is reversed on appeal, very few, if any, cases have the press coverage and widespread dissemination of information that are present here. Thus, contrary to the majority’s position, the fact that Tsarnaev, should he be convicted, will be able to raise his arguments in an appeal does not defeat the irreparable harm prong.[54]
*47 Another consideration the majority fails to adequately consider is the harm that will be done to the judicial system as a whole. In In re Cargill, Inc., 66 F.3d 1256 (1995), a case involving a mandamus petition for a judge’s recusal, we held that “[pjublic confidence in the courts may require that such a question be disposed of at the earliest possible opportunity.” Id. at 1262. Though the issue here is change of venue and not recusal, the concern over “public confidence” is just as vital. It is not just Tsarnaev that is on trial as a result of the issues before us, but also the integrity of our federal judicial system. The entire world is watching to see how the American values of “innocent until proven guilty” and “the right to a fair trial” — values we proudly proclaim — are applied in the toughest of cases, where the most allegedly despicable of defendants are on the docket. The actions taken by the district court cast doubt on the tenets by which our entire system is based, and it is thus necessary for us to act.
There is serious doubt in the public sphere that Tsarnaev can receive a fair trial in the District of Massachusetts. Major papers throughout the world have published articles suggesting that the trial should be moved outside of Boston.[55] For example, a survey of 1,000 Massachusetts residents showed that only 47% of those polled were confident that Tsarnaev would receive a fair trial.[56] While only 8% were not at all confident, the other 43% (2% of the respondents were unaccounted for) had varying levels of doubt as to whether *48 or not Tsarnaev could receive a fair trial.[57] Many legal publications agree.[58] But perhaps most notably, prospective jurors themselves have stated that “it will be very tough to find an impartial jury this close to the crime,” that the trial is a “waste of time and money,” and that “there is no way [the juror] could be impartial.” [59]
Yet, instead of alleviating any doubt as to the fairness of the proceedings, the district court has repeatedly refused to grant Tsarnaev’s motions for change of venue. Not only that, it often refuses to act at all. Tsarnaev filed his second motion for change of venue on December 1, but the district court sat on the motion for a month before issuing its denial. In addition to this being just five days before jury selection was to begin, it was also New Year’s Eve. Unfortunately, the district court went further and criticized Tsarnaev for filing the motion to begin with. See Op. and Order, Jan. 2, 2015, Case No. 13-10200, EOF No. 887, 1-6 (characterizing the motion as an ill-timed and delayed motion for reconsideration despite Tsarnaev’s attempt to supplement the record with additional facts and reports supporting community bias). A similar practice occurred when Tsarnaev filed his third motion for a change of venue. Again, the district court failed to act promptly. It sat on the motion for sixteen days and only issued an order once the instant petition for mandamus was filed. The district court did, however, immediately act to chastize Tsarnaev’s defense team for publicly including quotes from the jury questionnaires. See Text Order, Jan. 22, 2015, Case No. 13-10200, ECF No. 983. Though there may have been legitimate reasons for these delays and criticisms, to the public, these actions may suggest that Tsarnaev’s attorneys are being punished for doing their jobs.[60]
Rather than stepping in to remedy this appearance of injustice and restore faith in the system before its integrity is irreparably damaged, the majority has largely sidestepped the issue. As I noted in my dissent to Tsarnaev’s first petition for mandamus, the majority denied his petition within hours of receiving the complete briefing. In re Tsarnaev, 775 F.3d 457, 457-59 (1st Cir.2015) (Torruella, J., dissenting). In today’s opinion, it likewise focuses not on the merits, but the “onerous” burden Tsarnaev must overcome.
Let us recap: Tsarnaev was filmed being arrested after a four-day manhunt; the entire city, which in itself is a victim, came together and adopted “Boston Strong” as a sign of camaraderie; national media outlets had essentially stopped covering the bombing and its aftermath prior to trial, but the local news (both television and *49 print) continue to report on it daily; jury selection is being conducted in the Moakley Courthouse, which is just a few miles from the Marathon’s finish line, and which has become a heavily guarded fortress surrounded by a media circus; the district court has been slow in acting on Tsarnaev’s motions and repeatedly criticizes his attorneys for zealously advocating on his behalf; and when Tsarnaev seeks relief from this court, a majority rebuffs his pleas. This is not the kind of “American Justice” that is expected of the federal courts, particularly in a criminal death-penalty case of this magnitude and import.
As Justice Sotomayor opined in Skilling, “our system of justice demands trials that are fair in both appearance and fact.” Skilling, 561 U.S. at 464, 130 S.Ct. 2896 (Sotomayor, J., concurring in part and dissenting in part). By failing to act now, the majority is only furthering the perception that this whole trial has a pre-ordained outcome and that our “guarantee of due process” is nothing but an empty promise. See Rideau, 373 U.S. at 726, 83 S.Ct. 1417 (“Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.... The kangaroo court proceedings in this case involved a more subtle but no less real deprivation of due process of law.”).
A mandamus order from this court could have saved the district court’s clear error, avoided some of the danger of mistrial on the basis of a prejudiced jury pool, and precluded the irreparable harm that, thanks to the media eircús bound to form around this trial, would mar any subsequent trial for Tsarnaev in the event of such a mistrial or reversed conviction. Such irreparable harm is not limited to Tsarnaev himself, but also extends to the damage done to the credibility and integrity of our legal system. With today’s decision, any chance of avoiding such harm is now gone.
C. The Equities Favor Transfer
Finally, for the writ to issue, the equities, on balance, must favor the petition. In re Bulger, 710 F.3d at 45. Such is the case here. Even assuming this is a “close case,” which I do not think it is, we should err on the side of caution. Again, let us not forget, this is a death penalty case. As the Supreme Court stated in Irvin, “[wjith his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion.” 366 U.S. at 728, 81 S.Ct. 1639. The government, the district court, and the majority have failed to proffer any strong, persuasive case or reason why the equities should weigh against transfer. Indeed, their supposedly strongest point— that “the trial be held where the crimes were committed” so that, in part, “[m]embers of the community will have access to the trial and to the court room,” ante, at 29 is factually inaccurate. While the trial may be held where the crime was committed, the public will not have access. Instead, the public and the victims will be relegated to “overflow” rooms where they can watch the proceedings on closed-link video cameras. There is no reason that a trial being held in a different district could not similarly be broadcast. Indeed, that is exactly what happened in McVeigh. Accordingly, any legitimate doubt that Tsarnaev cannot receive a fair trial tips the equities in favor of issuing the writ and requiring a transfer out of this district.
III. Conclusion
“[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, ‘indifferent’ jurors.” Irvin, 366 U.S. at 722, 81 S.Ct. 1639. As I *50 have explained above, almost the entire pool of potential jurors has been compromised by the Bostón Marathon bombings in one respect or another. Even though potential jurors may have the best of intentions, I believe it is impossible to empanel a jury in this jurisdiction that is impartial, let alone indifferent.
I understand what this trial means for the community: an opportunity for closure, a sense of justice. But what makes both America and Boston strong is that we guarantee fundamental constitutional rights to even those who have caused us the greatest harm. Rather than convicting Tsarnaev and possibly sentencing him to death based on trial-by-media and raw emotion, we must put our emotions aside and proceed in a rational manner. This includes guaranteeing that Tsarnaev is given a fair trial .and accorded the utmost due process. The actions of the district court and the majority of this court fall short of these ideals.
Tsarnaev is entitled to a writ of mandamus ordering the district court to grant Tsarnaev’s motion for a change of venue. Because this court refuses to grant this relief, I strongly dissent.

. This section contains a brief summary of the events surrounding the bombing and subsequent manhunt. For a minute-by-minute recap of those four days, see Sara Morrison and Ellen O’Leary, Timeline of Boston Marathon Bombing Events, Boston.com (Jan. 5, 2015), http://www.boston.com/news/local/ massachusetts/2015/01/05/timeline-bostonmarathon-bombing-events/qiYJmANmó DYxqsusVqóóyK/story.html.

. Maria Cramer & Peter Schworm, Note May Offer Details on Bomb Motive, Boston Globe, May 16, 2013, http://www.bostonglobe. com/metro/2013/05/16/sources-bomb-suspectdzhokhar-tsarnaev-took-responsibility-formarathon-attacks-note-scrawled-boat/UhBOm EByeWVxGd IRAxzOtO/story.html.

. See "We got him!”: Boston Bombing Suspect Captured Alive, NBC News (Apr. 19, 2013), http://usnews.nbcnews.com/_news/ 2013/04/20/17823265-we-got-him-boston-bombing-suspect-captured-alive?lite.

. Id.

. See, e.g., Live Blog: Bombings at the Boston Marathon, http://live.boston.com/Event/ Live_blog_Explosion_in_Copley_Square? Page=0 (last visited Feb. 20, 2015); Boston Bombing Manhunt: Watch the Live Streaming Video, Inquisitir (Apr. 19, 2013), http://www. inquisitr. com/625705/boston-bombingmanhunt-watch-the-livestreaming-video/ ("Developments in this active and intense search are rapidly unfolding minute by minute. Live feeds to the local television media coverage of the Boston bombing manhunt are embedded below.”); Boston Transit Shut Down, Nearly 1 Million Sheltering in Place amid Terror Hunt, NBC News (Apr. 19, 2013), http://usnews.nbcnews.com/_news/ 2013/04/19/17822687-b ostontransit-shutdown-nearly-1-million-sheltering-in-pláceamid-terror-hunt?lite (embedding a video with the caption "Video of firefight between suspects and police”).

. See, e.g., Eric Moskowitz, Long After Marathon Blasts, Survivor Loses Leg, Boston Globe, Nov. 11, 2014, http://www.bostonglobe.com/ metro/2014/11/11/long-after-marathon-bombings-survivor-loses-leg/urutULO 5 K3 H3 3 jlOGoLiNI/story.html; Boston Marathon Bombings-One Year Later, Boston Globe, http://www.bostonglobe.com/metro/specials/ bostonmarathon-bombings-year-later (last visited Feb. 20, 2015) (detailing numerous stories about the city's recovery and the victims over the year since the marathon); Bella English & Sarah Schweitzer, Some Affected by *32 Bombing Will Be at Race, but Others Won't, Boston Globe, Mar. 30, 2014, http://www. bostonglobe.com/metro/2014/03/29/marathonvictims-ponder-returning-marathon/SkxPdl RkvCHZp5YDweJ64K/story.html; Jaclyn Reiss, Unease Lingers a Year After Manhunt, Boston Globe, Mar. 9, 2014, http://www. bostonglobe.com/metro/regionals/wesl/2014/ 03/09/watertown-residents-question-police-tactics-manhunt-for-bombing-suspects/V2c AugxzqcNvlsP82pLZ2iystory.html.

. Ben Zimmer, “Boston Strong,” the Phrase that Rallied a City, Boston Globe, May 12, 2013, http ://www.bostonglobe.com/ideas/ 2013/05/11/boston-strong-phrase-that-rallied-city/uNPFaI8Mv4QxsWqpjXBOQO/story.html.

. See, e.g., Twitter Chatter, UPDATE: The Man Who Shoveled the Marathon Finish Line Has Been Found, BDCwire (Jan. 28, 2015), http://www.bdcwire.com/who-shoveled-themarathon-finish-line/.

. Indeed, some even thought April 19, the day of the shelter-in-place order, was “so much scarier” than April 15, the day of the bombing itself. See Alan GreenBlatt, Boston on Lockdown: “Today Is So Much Scarier”, (Apr. 19, 2013), http://www.npr.org/blogs/ thetwo-way/ 2013/04/19/177934915/The-Scene-In-Boston-Today-Is-So-Much-Scarier (quoting a resident).

. These cases involved either Rule 21(b) of the Federal Rules of Criminal Procedure or 28 U.S.C. § 1404(a). While the present petition invokes Rule 21(a), this distinction is irrelevant. All three provisions involve a request to change venue. If mandamus is appropriate for convenience purposes, or in the civil context, it must surely be available when the change of venue is due to a prejudiced jury, where the constitutional implications are magnified. In fact, the government conceded at the hearing that if a presumption of prejudice ■was established, and the district court still refused to transfer venue, then mandamus relief would be appropriate, assuming the other mandamus factors were satisfied.

. When I refer to Boston, I am referring not only to the city of Boston but also to the surrounding neighborhoods and suburbs which make up the greater Boston metropolitan area and from which the jury pool is being drawn.

. See, e.g., The Associated Press, Marathon Bombing Aftermath Was Top Massachusetts Story of 2014, MassLive (Dec. 26, 2014), http://www.masslive.com/news/index.ssi72014/ 12/marathon_bombing_aftermath_was.html ("The legal aftermath of the Boston Marathon attacks dominated headlines in Massachusetts in 2014, much as the attack itself did last year and the accused bomber’s trial surely will in 2015.”).

. Because this is a death penalty case, each party has been allotted twenty-three peremptory challenges. Thus, to seat the twelve jurors and six alternates, sixty-four jurors need to be qualified. The district court, however, has opted to qualify more than the necessary sixty-four “to be safe.”

. The majority accuses Tsarnaev, and me, of choosing “selective quotations” which are "misleading,” ante, at 28. It also notes that its "own review of those materials shows that the district court is in fact identifying provisionally qualified jurors with no or few and, at most, attenuated claimed connections to the bombings.” ante, at 21. Yet, of the seventy-five provisionally qualified jurors, forty-two self-identified as having some connection to the events, people, and/or places at issue. And twenty-three stated in their questionnaires that they had formed the opinion that Tsarnaev is guilty; of those twenty-three, one even stated that he would be unable to set that belief aside.

. Indeed, that is precisely what one prospective juror in this case said during voir dire: "I can’t unforget what I already know.”

. The argument advanced by the government distinguishing McVeigh on the grounds that the trial had to be moved because of the damage to the courthouse is disingenuous. A simple reading of the opinion makes clear that while the courthouse was damaged, that was not the reason for the venue change. Moreover, the contention that McVeigh is different because in that case the parties agreed the trial should not occur in Oklahoma City only supports the argument that trial in Boston is inappropriate. With almost identical facts, the government and the district court judge in McVeigh acknowledged on their own accord that a trial in Oklahoma City would be fundamentally and unconstitutionally unfair.

. The only real difference between the two cases is that Tsarnaev, though a naturalized citizen, is foreign-born and may have been influenced by overseas terrorist organizations while McVeigh is often referred to as a "home-grown” terrorist. Given that distinguishing the two cases on the basis of national origin would likely be constitutionally impermissible, we must presume that the government and district court are relying on some other, unnamed distinction. However, they have failed to present another persuasive, material distinction between the two cases, and I can find none.

.The majority's contention that the Boston Strong theme is irrelevant because it "is about civic resilience and recovery” and "is not about whether petitioner is guilty or not” or whether a prospective juror "could not be fair and impartial,” ante, at 25, n. 13, is struthious. The very fact that a prospective juror needs to express "resilience” and "recovery” is eloquent evidence that he or she was affected by the events.

. The majority contends that this is a "remarkable statement” which is "completely unfounded,” ante, at 24, n. 10. But " ‘common sense should not be left at the courthouse door.’ ” District of Columbia v. Greater Wash. Bd. of Trade, 506 U.S. 125, 135 n. 3, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (Stevens, J., dissenting) (quoting Schultz v. Nat’l Coal. of Hispanic Mental Health & Human Servs. Orgs., 678 F.Supp. 936, 938 (D.D.C. 1988)). Indeed, 94% of potential jurors who filled out a questionnaire stated that they had been exposed to "moderate” or "a lot” of publicity. To suggest that this exposure did not include the bloodied image of Tsarnaev belies common sense.

. The majority places too much emphasis on the fact that "95% of the dwellings in Gibson County” received the local newspapers carrying the prejudicial information, Irvin, 366 U.S. at 725, 81 S.Ct. 1639, whereas the subscription rates for the local newspapers in the Eastern Division of the District of Massachusetts are significantly lower. In today’s media-saturated environment, physical newspapers are obviously not the sole source of news and information. Instead, people receive their information from a wide variety of sources — newspapers, local news broadcasts, twenty-four-hour cable television, the Internet, etc. Indeed, many people access the newspaper online, which in many cases obviates the need for a subscription.

.Contrary to the majority’s implications, recent Supreme Court caselaw has not cast doubt on Irvin. The main case the majority relies on, Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), is readily *42 distinguishable on its facts. Yount involved the publicity surrounding a retrial which was "greatly diminished" due to the "lapse in time” between the events and the second trial. Id. at 1032, 1033, 104 S.Ct. 2885. Moreover, the “community sentiment had softened” from the "extensive adverse publicity and the community's sense of outrage [which] were at their height prior to Yount's first trial in 1966.” Id. That the Supreme Court ruled that the facts in a subsequent case did not warrant a change of venue is a far cry from suggesting that Irvin is no longer good law. Irvin has not been overruled, either explicitly or implicitly. If it had, it would be quite odd for Justice Sotomayor to rely on it so heavily in her Skilling dissent. Thus, Irvin still provides valuable and on-point precedent.

. See, e.g., Lloyd Vries, 2nd Sniper Trial Venue Changed, CBS News (July 24, 2003), http:// www.cbsnews.com/news/2nd-sniper-trialvenue-changed/ ("The trial of sniper suspect John Allen Muhammad will be moved 200 miles from Prince William County to Virginia Beach, a judge ruled Wednesday. Circuit Judge LeRoy Millette said it 'has been clearly shown that such a change of venue is necessary to ensure a fair and impartial jury.”); Stephen Braun, Judge Changes Sniper Trial Venue, L.A. Times, July 3, 2003, http://articles. Iatimes.com/2003/jul/03/nation/na-sniper3
("Citing concerns that pretrial publicity would make it impossible to select an impartial jury, a Virginia judge Wednesday ordered the Washington-area serial sniper murder trial of Lee Boyd Malvo moved 200 miles south of the capital suburbs.”).

. The majority cites to cases involving the 1993 World Trade Center bombing to suggest that high-profile terrorism cases can be tried in the district where the crime occurred. See United States v. Yousef, No. S12 93 Cr. 180(KTD), 1997 WL 411596, at *3 (S.D.N.Y. July 18, 1997); United States v. Salameh, No. S5 93 Cr. 0180(KTD), 1993 WL 364486, at *1 (S.D.N.Y. Sept. 15, 1993). However, unlike here, there is no evidence that the amount of pretrial press, the-personal impact stories, or the day-to-day focus on the events was any different in New York City than it was nationwide. Unlike here, the Second Circuit noted "press coverage had substantially subsided by the time Yousef was brought to trial, and there was minimal publicity in the months immediately preceding his trial.” United States v. Yousef, 327 F.3d 56, 155 (2d Cir. 2003). Also of note, New York City is significantly larger and more diverse than Boston; very few places are comparable to New York City. Comparing New York to Boston is like comparing an apple to a bean, rather than apples to apples.

. See, e.g., In Matters of Justice, It’s Personal, Boston Globe, Feb. 6, 2015, https://www. bostonglobe.com/opinion/2015/02/05/mattersjustice-personal/1 HXYIwyRx22 d4Pvtxh2 S O J/ story.html (noting that a SocialSphere survey of 1000 Massachusetts residents found that 90% thought Tsarnaev was guilty or probably guilty); Shira Schoenberg, Dzhokhar Tsarnaev Trial: Judge, Lawyers Sift Through Potential Jurors’ Ties to Boston Marathon Bombing, MassLive (Jan. 16, 2015), http://www. masslive.com/news/boston/index.ssf/2015/01/ dzhokhar_tsarnaev_trial_judges.html ("Given the enormous publicity surrounding the bombings, it would be nearly impossible to find jurors who are unfamiliar with the case.”).

. See, e.g., Boston Bombings Suspect Dzhokhar Tsarnaev Left Note in Boat He Hid in, Sources Say, CBS News (May 16, 2013), http://www.cbsnews.com/news/bostonbombings-suspect-dzhokhar-tsarnaev-leftnote-in-boat-he-hid-in-sources-say/ ("B oston bombing suspect Dzhokhar Tsarnaev left a *44 note claiming responsibility for the April 15 attack on the Boston Marathon____").

. See, e.g., Evan Pérez, Boston Bombing Trial Lawyers Fail to Reach Plea Deal, CNN (Jan. 5, 2015), http://edition.cnn.com/2015/ 01/05/poli-tics/dzhokhar-tsarnaev-trial-plea-deal-fails/index.html ("The discussions in recent months have centered on the possibility of Tsarnaev pleading guilty and receiving a life sentence without parole.... [b]ut the talks have reached an impasse because the Justice Department has resisted removing the death penalty....").

. See, e.g., The Associated Press, Marathon Bombing Aftermath Was Top Massachusetts Story of 2014, MassLive (Dec. 26, 2014), http://www.masslive.com/news/index.ssl/2014/ 12/marathon_bombing_aftermath_was.html ("The legal aftermath of the Boston Marathon attacks dominated headlines in Massachusetts in 2014, much as the attack itself did last year....”); Timeline: Dzhokhar Tsarnaev in the Globe, Boston Globe, Dec. 24, 2014, http:// www.bostonglobe.com/2014/12/24/timelinedzhokhar-tsarnaev-globe/16 Q JTbj 8ql5 dKh NGv MuVFJ/story.html (collecting every Boston Globe news story related to Tsarnaev).

.See, e.g., Jonel Aleccia, Boston Bomb Attack Triggered PTSD in Local Kids, Study Finds, NBC (May 30, 2014), http://www.nbcnews. com/health/health-news/boston-bomb-attacktriggered-ptsd-local-kids-study-finds-nl 18856 (noting that "in addition to [PTSD], researchers detected a range of other disturbing emotional and behavioral responses in kids who felt the impact of the manhunt close to home,” and that "[e]veryone in Boston has a story of what they did during the shelter-in-place request”); Alan GreenBlatt, Boston on Lockdown: “Today Is So Much Scarier”, NPR (Apr. 19, 2013, http://www.npr.org/blogs/ thetwo-way/2013/04/19/177934915/TheScene-In-Boston-Today-Is-So-Much-Scarier.

. See, e.g., Kevin Johnson, Paris and Boston Attacks Pose Striking Parallels, USA Today, Jan. 9, 2015, http://www.usatoday.com/story/ news/nation/2015/01/08/paris-boston-attacks/ 21445461/ (commenting that “there was no escaping the striking similarities between the assault on the Paris offices of a popular satirical newspaper and the 2013 Boston Marathon bombings” and quoting Massachusetts Representative William Keating as stating that “[ajgainst the backdrop of jury selection ..., it’s like Boston is reliving what happened all over again.... I’m watching what's happening in Paris, and I’m thinking of Water-town.”).

. See, e.g., Meg Wagner & Jason Silverstein, Boston Bartender Chris Laudani Clears Snow from Boston Marathon Finish line as Massachusetts Begins Blizzard Cleanup, N.Y. Daily News, Jan. 28, 2015, http://www.nydailynews. com/news/national/boston-beginsblizzardcleanupclears-marathon-finish-line-article1.2094673.

. See, e.g., Milton J. Valencia, Tsarnaev Friend to Plead Guilty, Boston Globe, Jan. 13, 2015, http://www.bostonglobe.com/metro/ 2015/01/13/judge-sets-j an-plea-hearing-for-friend-boston-marathon-bombers/SPbRARYlk YS5XYJMrZNFcM/story.html.

. See, e.g., The Associated Press, Judge Rejects Bid to Delay Tsarnaev Trial over Paris Attacks, Boston Herald, Jan. 14, 2015, http:// www.bostonherald.com/news_opinion/local_ coverage/2015/0 l/judge_rej ects_bid_to_delay_ tsarnaev_triaLover_paris_attacks.

. At the hearing, Tsarnaev explained that all of these events occurred after the questionnaires were filled out, and while the district court has generally asked prospective jurors whether they were aware of these events, it has cut off questioning into how in-depth this knowledge is or how it has affected the prospective juror.

. Another option, which none of the parties have suggested, would be to select jurors from another jurisdiction and then bring them to the District of Massachusetts for the trial. Though this practice is very rare, it is not unheard of. See Commonwealth v. Moore, Docket No. 169, Crim. No. 2011-10023, at *3, 5 (Mass.Sup.Ct. Oct. 5, 2012) (ordering a "partial change in venue” whereby the trial would be held in Suffolk County but the jury would be "draw[n] from a Worcester County jury venire”).

. The majority misunderstands the nature of modern media coverage of high-profile criminal trials, and the distinction between prior coverage in Boston versus the rest of the country. Since the Marathon bombing, media coverage of the story has never ceased in Boston, where the story remains present and at the fore of the public's interest. On the national stage, however, in the two-year gap between the bombing and the start of jury selection, media coverage has waned and pales in comparison to local coverage. Nonetheless, given the American experience with high-profile criminal trials over the past few decades, there is every reason to expect that the national news media (including 24-hour cable channels, radio, print newspapers, social media, and internet sources) will ramp up with Tsarnaev’s trial and engage in the relentless, highly detailed, omnipresent coverage that characterized criminal trials such as those of OJ. Simpson, Casey Anthony, the Menéndez Brothers, Jeffrey Dahmer, Phil Spector, and Ted Bundy. See, e.g., Casey Anthony Murder Trial Gamers Extensive Media Coverage: Cable and Broadcast TV Coverage Draws Comparison to the Trials of OJ. Simpson and the Menúdez Brothers, L.A. Times, July 6, 2011, http://articles.latimes. com/201 l/jul/06/entertainment/la-et-casey *47 anthony-trial-sidebar-20110706 (noting, among other things, that "[m]ore than 600 press passes were doled out for media coverage, and every major broadcast network has had at least one reporter at the trial”); see also Emily Shire, From O.J. to ‘Serial’: We’re All Armchair Jurors Now, The Daily Beast (Jan. 23, 2015), http://www.thedailybeast. com/articles/2015/01/23/from-o-jtoserial-were-all-armchair-jurors-now.html ("It’s the 20th anniversary of the start of O.J. Simpson's trial, a media event which led to an explosion of courtroom TV and loud legal experts....”); id. ("The 24 — hour cable news network meant that the murder trial was transformed into a celebrity-making machine. Simpson, his defense team, his prosecutors, the judge, and cable legal analysts all became characters in the most gripping drama on television.”); id. (“Transforming television viewers into jurors who were chomping at the bit to declare guilt or innocence drove the media coverage of the most sensationalized trials of the next 20 years: Scott Peterson, Casey Anthony, Jodi Arias.”).

. See, e.g., Joe D'amore, Tsarnaev Trial Should Not Be in Boston, Gloucester Times, Feb. 9, 2015, http://www.gloucestertimes. com/opinion/letter-tsarnaev-trial-should-notbe-in-boston/article_8155d310-7ba2-5046-a9 aa-5406973c3df6.html; Thomas Farragher, Tsarnaev Trial Should Be Moved to Another Venue, Boston Globe, Feb. 7, 2015, https:// www.bostonglobe.com/metro/2015/02/06/ tsarnaev-trial-should-moved-another-venue/5 HovPmXyldTyvlXhV5VzSI/story.html ("Most potential jurors don’t think Tsarnaev is guilty. They know he’s guilty.”); Danny Cevallos, Can Tsarnaev, Hernandez, Holmes Get Fair Trials?, CNN (Jan. 29, 2015), http://www.cnn. com/2015/01/28/opinion/cevallos-major-trialspretrial-publicity/; Thaddeus Hoffmeister, The Judge Should Rethink His Decision to ■ Try Tsarnaev in Boston, N.Y. Times, Jan. 7, 2015, http://www.nytimes.com/roomfordebate/2015/ 01/07/when-a-local-jury-wont-do/the-judge-should-rethink-his-decision-to-try-tsarnaev-inboston; Richard Lind, The Judge's Decision in the Tsarnaev Case Sets a Bad Precedent, N.Y. Times, Jan. 7, 2015, http://www.nytimes.com/ roomfordebate/2015/01/07/when-a-local-jurywont-do/the-judges-decision-in-thetsarnaev-casesets-a-bad-precedent-19; Harvey Silverglate, Why the Tsarnaev Trial Should Be Moved, Delayed, Boston Globe, Jan. 2, 2015, http://www.bostonglobe.com/opinion/ 2015/01/02/why-tsarnaev-trial-shouldmoved-delayed/K2is6uVCol79w6JzDLvZYJ/story. html.

. In Matters of Justice, It's Personal, Boston Globe, Feb. 6, 2015, http://www.bpstonglobe. com/opinion/2015/02/05/matters-justice-personal/1HXYI wyRx22d4P vtxh2 S O J/story. html.

. Id.

. See, e.g., Andrew Cohen, Can Tsarnaev Get a Fair Trial in Boston? Of Course Not., Brennan Center for Justice (Jan. 9, 2015), http:// www.brennancenter.org/analysis/cantsarnaev-get-fair-trial-boston-course-not.

. It is worth noting that many other prospective jurors conveyed similar sentiments regarding the unlikely prospect of Tsarnaev receiving a fair trial. While these prospective jurors were hopefully struck for cause, their comments only further highlight the strong views in the community.

. See, e.g., Alysha Palumbo, Tsarnaev Lawyers Defend Use of Juror Quotes to Move Trial, New England Cable News (Jan. 23, 2015), http://www.necn.com/news/new-england/ Boston-Marathon-Bombing-SuspectDzhokhar-Tsarnaev-Jury-SelectionContinues-289565681.html; Pete Williams, Judge Chides Tsarnaev Lawyers for Releasing Jurors’ Comments, NBC (Jan. 22, 2015), http:// www.nbcnews.com/news/us-news/judgechides-tsarnaev-lawyersreleasing-jurorscomments-n 291636.